729 A.2d 376

BOARD OF PHYSICIAN QUALITY ASSURANCE

v.

LESTER H. BANKS.

**Lester H. Banks**

**v.**

**Board of Physician Quality Assurance.**

**No. 87, Sept. Term, 1997.**

Court of Appeals of Maryland.

May 12, 1999.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; C. Frederick Ryland, Asst. Atty. Gen., on brief), Baltimore, for petitioners.

Kathleen Howard Meredith (Stephen Y. Brennan, Iliff & Meredith, P.C., on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

ELDRIDGE, Judge.

We issued a writ of certiorari in this case to decide whether the Board of Physician Quality Assurance could reasonably conclude that a physician's sexually harassing conduct towards co-employees, committed while the physician was on duty at the hospital and in working areas of the hospital, constitutes immoral or unprofessional conduct in the practice of medicine within the meaning of Maryland Code (1981, 1994 Repl.Vol.), § 14–404(a)(3) of the Health Occupations Article.

## I.

From 1986 until 1991, Dr. Lester H. Banks worked at Carroll County General Hospital as a medical-surgical house physician. As house physician, Dr. Banks was expected to work twelve hour shifts and was responsible for admitting patients into the hospital, caring for patients, and assisting in the operating room and emergency department. The house physician program was new to the hospital and was thus underutilized by the medical staff, resulting in considerable "down time" for the house physician. Because of the underutilization, Dr. Banks often agreed to work twenty-four and thirty-six hour shifts, frequently working as many as thirty shifts per month. When on duty, Dr. Banks was not free to leave the hospital and was expected to be available at all times. Nevertheless, when Dr. Banks was on duty but not utilized by the medical staff, he was free to sleep, eat, watch television, use the telephone, read, or visit with other employees in the hospital.

The evidence at the administrative hearing in this case disclosed the following. During the time Dr. Banks was employed by Carroll County General Hospital, he engaged in a pattern of sexually harassing female employees while he was on duty. A unit secretary at the hospital, witness # 1, stated that Dr. Banks on several occasions came to her work station and repeatedly touched her, rubbed her shoulders, back and neck, put his hands through her hair, and pinched her behind. She further stated that Dr. Banks "repeatedly made rude and

unnecessary comments, most often regarding sex." She testified that on one occasion, Dr. Banks approached her from behind and put his hands around her waist and squeezed her stomach. Witness # 1 was offended by Dr. Banks's unwelcome advances and told him to leave her alone. She indicated that Dr. Banks's "conduct often occurred in areas where patients, visitors, and other staff could observe the embarrassing advances." Witness # 1 reported the offensive conduct to her supervisor and also filed a written report describing the conduct.

Witness # 2, a unit secretary in the hospital's emergency department, also reported sexual harassment by Dr. Banks. She stated that on one occasion shortly after she began her employment at the hospital, Dr. Banks was waiting behind her to stamp some documents on the addressograph machine for a patient he was admitting. While he was waiting, Dr. Banks hit witness # 2 "very hard on the backside, causing her to jump in surprise." Witness # 2 testified that on another occasion, an employee had accidentally knocked over a cup of coffee, spilling coffee on witness # 2 and on her shoes. At that time Dr. Banks asked witness # 2 to retrieve a patient chart for him. Witness # 2 told Dr. Banks that she would retrieve the chart just as soon as she was able to clean the coffee off of herself. Dr. Banks responded, "[w]hy don't you let me lick it off." Witness # 2 told Dr. Banks that he was "disgusting" and that he should leave her alone. On a third occasion, Dr. Banks came to witness # 2's desk and asked her when she would go out with him, to which witness # 2 responded "never." An emergency department nurse observed and commented upon this last incident. Witness # 2 subsequently filed a complaint with the hospital administration concerning Dr. Banks's unwelcome behavior.

Witness # 3, an emergency department registrar at the hospital, testified that Dr. Banks asked her to go out with him for drinks. Witness # 3 declined, stating that she was only nineteen years old and that she had a steady boyfriend. On another occasion, witness # 3 was walking out of the ladies room into the hallway outside the emergency department

when Dr. Banks "pinned" her up against the wall with his arms and knee. She stated that they were so close that their stomachs were touching. Dr. Banks then asked witness # 3 "is it going to be your place or mine?" To this, witness # 3 replied "neither." Dr. Banks again asked her "when will it be?" She replied "never." An orderly who observed the incident pulled Dr. Banks away from witness # 3, allowing her to escape. Witness # 3 overheard Dr. Banks say to the orderly, "I guess she is not wet yet." Witness # 3 prepared a written report of this incident and subsequently filed a legal action against Dr. Banks.

The director of the emergency department at the hospital counseled Dr. Banks on several occasions regarding complaints about his conduct. In December 1987, the director counseled Dr. Banks concerning a comment Dr. Banks had made to a nurse, to the effect that "I'd like to get you behind closed doors." In May 1988, Dr. Banks was again counseled for a comment to a female employee, who was wearing red, that wearing red on certain days indicated sexual promiscuity. Finally, in September 1991, Dr. Banks was counseled concerning the incident with witness # 3. The hospital presented Dr. Banks with several options, and he elected to take a leave of absence. The hospital board of directors denied Dr. Banks's application for privileges as a result of his conduct.

The Board of Physician Quality Assurance received information that Dr. Banks had been denied privileges at Carroll County General Hospital and subsequently decided to charge Dr. Banks with violating § 14–404(a)(3) of the Health Occupations Article, which provides as follows:

"(a) *In general.*—Subject to the hearing provisions of § 14–405 of this subtitle, the Board, on the affirmative vote of a majority of its full authorized membership, may reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the licensee:

\* \* \*

(3) Is guilty of immoral or unprofessional conduct in the practice of medicine. . . ."

The Board issued charges and a summons to Dr. Banks to appear at a hearing before an administrative law judge (ALJ).

In a motion to dismiss the charges, Dr. Banks contended that the Board lacked jurisdiction and authority to take action in this case because Dr. Banks's conduct was not in the practice of medicine as is required by § 14–404(a)(3); rather, according to Dr. Banks, it did not even bear "the slightest relationship to [Dr. Banks's] performance of the practice of medicine, as that term is defined in § 14–101." Section 14–101(k) of the Health Occupations Article defines the "practice of medicine" as follows:

"(1) . . . to engage, with or without compensation, in medical:

(i) Diagnosis;

(ii) Healing;

(iii) Treatment; or

(iv) Surgery.

(2) "Practice of medicine" includes doing, undertaking, professing to do, and attempting any of the following:

(i) Diagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment or supposed ailment of an individual. . . . "

The ALJ reserved ruling on Dr. Banks's motion until after a hearing on the merits. After conducting the evidentiary hearing, the ALJ issued a proposed order finding the facts as previously outlined and concluding that Dr. Banks violated § 14–404(a)(3) by committing unprofessional conduct in the practice of medicine, on two different occasions, toward witness # 2. The ALJ further concluded that Dr. Banks's conduct involving witnesses # 1 and # 3 was not in the practice of medicine. The ALJ held that Dr. Banks's conduct while waiting to use the addressograph machine to admit a patient and requesting that witness # 2 obtain a patient record were "part of the undertaking of patient treatment" and were, therefore, within the "actual performance of the practice of medicine." The ALJ stated that Dr. Banks was not "undertaking the diagnosing, healing or treating of an individual

during the events described by witness #1 or witness #3." The ALJ proposed reprimanding Dr. Banks and requiring an evaluation by a psychiatrist to determine if psychiatric treatment was necessary.

The Board of Physician Quality Assurance adopted the ALJ's basic findings of fact but determined that all of Dr. Banks's above-described conduct, including his conduct toward witnesses #1 and #3, constituted "immoral or unprofessional conduct in the practice of medicine." The Board took the position that Dr. Banks's conduct occurred within the "practice of medicine" because his "presence in the hospital and 'on-call' status clearly involved more than merely a 'general or associative' relationship with his practice as a physician." Furthermore, the Board reasoned that a "hospital environment must at all times be conducive to the practice of medicine" because at "any time, an unforseen patient care emergency may require intensive team effort necessarily involving both physicians and hospital staff." It determined that Dr. Banks's conduct "risks a breakdown of the cooperation [among] the medical team which is so necessary to patient treatment in a hospital setting." The Board held that, because Dr. Banks's "conduct affected and soured the hospital working environment, there was a direct impact on patient care, thus implicating the actual practice of medicine." The Board ordered that Dr. Banks be reprimanded and placed on probation subject to terms and conditions, including evaluation by a psychiatrist to determine if he should undergo psychotherapy.

Dr. Banks filed in the Circuit Court for Carroll County an action for judicial review of the Board's decision. The circuit court affirmed the Board's decision, reasoning that "the legislature did not intend to limit the application of Section 14–404(a)(3) to cases in which a physician is dealing with a patient directly, or face-to-face." The court agreed with the Board that all of Dr. Banks's immoral or unprofessional conduct towards the three witnesses was in the practice of medicine because it occurred while he was "on his shift at the hospital,"

"in uniform" (wearing scrubs), and present in the hospital "for the sole purpose of practicing medicine."

Dr. Banks appealed to the Court of Special Appeals which affirmed in part and reversed in part. *Banks v. Board of Physician Quality Assurance,* 116 Md.App. 249, 695 A.2d 1260 (1997). The intermediate appellate court held that, in order to discipline a physician under § 14–404(a)(3), the immoral or unprofessional conduct must occur "during the diagnosis, care, or treatment of patients." 116 Md.App. at 262, 695 A.2d at 1267. Using this definition of the "practice of medicine," the Court of Special Appeals affirmed the circuit court's decision with respect to witness # 2. The court reasoned that Dr. Banks's conduct was within the practice of medicine because using the addressograph machine and requesting a patient record were both "necessary procedure[s] and . . . part of the treatment of a patient." 116 Md.App. at 263, 695 A.2d at 1268. The Court of Special Appeals disagreed with the circuit court and the Board with respect to witnesses # 1 and # 3 because Dr. Banks was not "diagnosing, caring for, or treating patients while he was sexually harassing witnesses one or three." 116 Md.App. at 263, 695 A.2d at 1267.

Both sides filed petitions for a writ of certiorari, and this Court granted both petitions. *Board of Physicians v. Banks,* 347 Md. 683, 702 A.2d 291 (1997). Although worded differently, both petitions presented essentially the same issue, namely whether Dr. Banks's conduct, as previously described, constituted immoral or unprofessional conduct in the practice of medicine within the meaning of § 14–404(a)(3) of the Health Occupations Article.

## II.

### A.

A court's role in reviewing an administrative agency adjudicatory decision is narrow, *United Parcel v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226, 230 (1994); it "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclu-

sions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel,* 336 Md. at 577, 650 A.2d at 230. *See also* Code (1984, 1995 Repl.Vol.), § 10–222(h) of the State Government Article; *District Council v. Brandywine,* 350 Md. 339, 349, 711 A.2d 1346, 1350–1351 (1998); *Catonsville Nursing v. Loveman,* 349 Md. 560, 568–569, 709 A.2d 749, 753 (1998).

 In applying the substantial evidence test, a reviewing court decides " ' "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." ' " *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978). See *Anderson v. Dep't of Public Safety,* 330 Md. 187, 213, 623 A.2d 198, 210 (1993). A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. *CBS v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990). A reviewing court " 'must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence' and to draw inferences from that evidence." *CBS v. Comptroller, supra,* 319 Md. at 698, 575 A.2d at 329, quoting *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834–835, 490 A.2d 1296, 1301 (1985). *See Catonsville Nursing v. Loveman, supra,* 349 Md. at 569, 709 A.2d at 753 (final agency decisions "are *prima facie* correct and carry with them the presumption of validity").

 Despite some unfortunate language that has crept into a few of our opinions,[1] a "court's task on review is *not* to ' " 'substitute its judgment for the expertise of those persons who constitute the administrative agency,' " ' " *United Parcel v. People's Counsel, supra,* 336 Md. at 576–577, 650 A.2d at

---

**1.** *Liberty Nursing v. Department,* 330 Md. 433, 443, 624 A.2d 941, 945–946 (1993); *Caucus v. Maryland Securities,* 320 Md. 313, 324, 577 A.2d 783, 788 (1990); *State Election Bd. v. Billhimer,* 314 Md. 46, 59, 548 A.2d 819, 826 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *Supervisor v. Asbury Methodist Home,* 313 Md. 614, 626, 547 A.2d 190, 196 (1988).

230, quoting *Bulluck v. Pelham Wood Apts., supra,* 283 Md. at 513, 390 A.2d at 1124. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. *Lussier v. Md. Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ("The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight").[2] Furthermore, the expertise of the agency in its own field should be respected. *Fogle v. H & G Restaurant,* 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make "significant discretionary policy determinations"); *Bd. of Ed. For Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ("application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the" legal issues).

### B.

At the outset, we point out that there was clearly substantial evidence supporting the ALJ's findings of basic facts which were adopted by the Board. The testimony and written statements by witnesses 1, 2, and 3 directly supported the administrative findings of fact. Moreover, the ALJ and the Board were certainly justified in characterizing Dr. Banks's conduct as "immoral or unprofessional conduct." The only real disputed issue in these judicial review proceedings has

---

**2.** On the other hand, when a statutory provision is entirely clear, with no ambiguity whatsoever, "administrative constructions, no matter how well entrenched, are not given weight." *Macke Co. v. Comptroller,* 302 Md. 18, 22–23, 485 A.2d 254, 257 (1984).

been whether Dr. Banks's conduct occurred "in the practice of medicine."

In light of the principles outlined in Part II A above, we believe that the Board's conclusion, that Dr. Banks's conduct with regard to witnesses 1, 2 and 3, occurred "in the practice of medicine," was reasonable. The circuit court correctly affirmed the Board's decision.

In 1888, the Maryland Legislature adopted an "original Act creating a system for the regulation of the practice of medicine and surgery in Maryland." *Aitchison v. State,* 204 Md. 538, 544, 105 A.2d 495, 498, *cert. denied* 348 U.S. 880, 75 S.Ct. 116, 99 L.Ed. 692 (1954). Section 7 of this Act authorized denial or revocation of a physician's certificate upon proof of "unprofessional or dishonorable conduct." Ch. 429 of the Acts of 1888. It was not until 1968 that Maryland law required that the immoral or unprofessional conduct of the physician occur *in the practice* of medicine. Ch. 469 of the Acts of 1968.[3] Section 14–404(a)(3) of the Health Occupations Article is the most recent version of this statute, requiring that the physician's conduct be "immoral or unprofessional conduct in the practice of medicine."

On one previous occasion this Court examined what is embraced by the phrase "in the practice of medicine." In *McDonnell v. Comm'n on Medical Discipline,* 301 Md. 426, 429–430, 483 A.2d 76, 77–78 (1984), we considered the question of whether a physician's attempt to intimidate adverse expert witnesses scheduled to testify against him in a medical malpractice case was "[i]mmoral conduct of a physician in his practice as a physician" in violation of § 14–404(a)(3)'s statutory predecessor, Code (1957, 1980 Repl.Vol.), Article 43, § 130(h)(8). We held that, although Dr. McDonnell's conduct was "improper and not to be condoned," it was "not censurable

---

**3.** Ch. 469 of the Acts of 1968 allowed a physician to be disciplined for "[i]mmoral conduct of a physician in his practice as a physician." Ch. 469 repealed former Article 43, § 145, which merely required "conviction of crime involving moral turpitude or unprofessional or dishonorable conduct."

under § [14–404(a)(3)]." *McDonnell,* 301 Md. at 434, 483 A.2d at 80. The Court agreed that Dr. McDonnell's act was "related to his professional practice" but was insufficient to bring his conduct within the statute's requirement that the conduct occur in his "practice as a physician." 301 Md. at 437, 483 A.2d at 81. We held that immoral conduct merely committed during the term of licensure or having only a "general or associative relationship to the physician in his capacity as a member of the medical profession" is not within the language of the statute. 301 Md. at 436, 483 A.2d at 81. Rather, the "application of [§ 14–404(a)(3)] is directly tied to the physician's conduct in the actual performance of the practice of medicine, *i.e.,* in the diagnosis, care, or treatment of patients." 301 Md. at 437, 483 A.2d at 81.

In the present case, the Board rejected Dr. Banks's argument that our *McDonnell* holding precluded Board action. The Board distinguished *McDonnell,* concluding that the "connection between [Dr. McDonnell's] conduct in the judicial arena and the practice of medicine is tenuous." The Board held that Dr. Banks's conduct was "closely associated with [his] practice as a physician" because of his "presence in the hospital and 'on-call' status." It reasoned that Dr. Banks's conduct had more than a "general or associative" relationship to the practice of medicine because it "affected and soured the hospital working environment," thereby having a "direct impact on patient care" and falling within the scope of § 14–404(a)(3).

Dr. Banks argues that none of his conduct is within the practice of medicine because, when it occurred, he was not diagnosing, treating or evaluating patients. He points out that when he committed these acts of sexual harassment, he was merely "chatting or socializing with co-workers." (Banks's brief at 11). In addition, Dr. Banks relies on the fact that these co-workers were not nurses, doctors, physician's assistants, or medical technicians, and, therefore were "not trained in the practice of medicine or nursing and [do] not participate directly in the care, treatment or diagnosis of patients." (*Id.* at 9.) Dr. Banks specifically disputes the Court

of Special Appeals' conclusion that he was practicing medicine during the incidents concerning witness # 2. He asserts that stamping a chart on the addressograph machine and requesting a chart from medical records are merely clerical functions which are not within the definition of diagnosing, caring for, or treating patients. Otherwise, he argues, when clerical personnel such as witness # 2 perform clerical tasks, they engage in the practice of medicine without a license. Dr. Banks states that when the addressograph incident occurred, he had not yet seen or diagnosed a patient. Similarly, he argues that when he requested that witness # 2 retrieve a chart for him, he merely wanted the chart in order to "sign off" on it, which is typically done when a patient has already been discharged.

We agree with the Board that this case is distinguishable from *McDonnell*. In *McDonnell*, the physician's conduct occurred during judicial proceedings against him based upon conduct constituting malpractice. His conduct did not occur in the workplace where he was present for the purpose of practicing medicine. Dr. McDonnell's conduct had only a "general or associative relationship" to his "capacity as a member of the medical profession" rather than being "directly tied to [his] conduct in the actual performance of the practice of medicine, i.e., in the diagnosis, care, or treatment of patients." *McDonnell*, 301 Md. at 436–437, 483 A.2d at 81.

■ The Board could reasonably hold that Dr. Banks's conduct of sexually harassing hospital employees was within the practice of medicine because he was on duty and in the working areas of the hospital. When on duty, Dr. Banks was responsible for admitting patients, caring for patients, and assisting in the operating room and emergency department. He was not free to leave, and he was expected to be available at all times. When Dr. Banks was on duty he was there for the purpose of practicing medicine; *i.e.*, for the "diagnosis, care, or treatment of patients." *McDonnell*, 301 Md. at 437, 483 A.2d at 81. Dr. Banks sexually harassed his co-workers who were present in the working areas of the hospital in connection with the practice of medicine. This conduct has

more than merely a "general or associative relationship" to Dr. Banks's capacity as a member of the medical profession. The connection to the practice of medicine was sufficient for the Board to conclude that it is "in the actual performance of the practice of medicine."

The Court of Special Appeals' interpretation and application of the statute creates a distinction without a difference. Under that court's analysis, Dr. Banks could not be sanctioned for his unwanted advances towards and touching of witness # 1 while she was at her work station but he could be disciplined for this conduct if he had asked witness # 1 to retrieve a chart for him or to prepare a patient's file. Similarly, Dr. Banks could not be sanctioned for accosting witness # 3 in the hallway unless witness # 3 was engaged in conduct such as retrieving a patient's chart or on her way to use the addressograph machine.

Dr. Banks urges that the practice of medicine be interpreted even more narrowly. He suggests that a physician may only be sanctioned under § 14–404(a)(3) if he or she is in the immediate process of diagnosing, evaluating, examining or treating a patient and engaged in a non-clerical task. This approach would lead to illogical results. For example, Dr. Banks concedes that a physician could be disciplined for exposing himself while examining an x-ray to determine whether a patient broke a bone because this is actual diagnosis and thus falls within the practice of medicine. (Banks's reply brief at 15–16). On the other hand, if the physician were to expose himself to a nurse in the hallway immediately before or after examining the x-ray, this would not be in the practice of medicine, and hence not within the purview of § 14–404(a)(3). This approach so narrowly construes § 14–404(a)(3) that it would lead to unreasonable results and render the statute inadequate to deal with many situations which may arise.

Other jurisdictions have rejected such a limited interpretation of statutes similar to § 14–404(a)(3) and have held that a medical professional's conduct in sexually harassing co-work-

ers and employees is within the practice of medicine. The Hawaii Supreme Court upheld a physician's suspension from the practice of medicine when he committed acts of sexual misconduct against his medical assistant in connection with her performance of clerical tasks. *Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 889 P.2d 705 (1995). The *Loui* court reasoned that this conduct was sufficient to satisfy the statutory requirement that the physician's conduct be " 'substantially related to the qualifications, functions, or duties of a physician.' " *Loui*, 78 Hawai'i at 30–31, 889 P.2d at 714–715. In *Flickinger v. Com., Dept. of State*, 75 Pa.Cmwlth. 84, 86–89, 461 A.2d 336, 337–338 (1983), the Pennsylvania court upheld the revocation of a chiropractor's license when he committed "gross . . . misconduct in carrying on of such profession" by sexually harassing his co-workers and employees.

The primary factors that distinguish this case from *McDonnell* were that Dr. Banks was on duty at the hospital, and was present in the working areas of the hospital. In other cases considering whether a physician's conduct was within the statutory requirement of "in the practice of medicine," a critical factor has been whether the conduct occurred while the physician was performing a task integral to his or her medical practice. Courts have not applied an extremely technical and narrow definition of the practice of medicine. For example, physicians have been disciplined for misconduct in the practice of medicine while performing clerical tasks such as billing third party payors. *See Wassermann v. Board of Regents of University*, 11 N.Y.2d 173, 177–179, 182 N.E.2d 264, 265–266, 227 N.Y.S.2d 649, 650–652, *cert. denied* 371 U.S. 861, 83 S.Ct. 116, 9 L.Ed.2d 99 (1962) (physician's license revoked due to finding of " 'fraud or deceit in the practice of medicine' " when physician submitted false reports and bills to an attorney even though the fraud was not perpetrated directly on the patient); *Catena v. Com., State Bd. of Medical Ed.*, 49 Pa.Cmwlth. 542, 543–547, 411 A.2d 869, 870–871 (1980) (physician's license suspended for fraudulent medicare claims in the "practice of medicine"). *See also Quintana v. Com., State Bd. of Ost. Med. Ex.*, 77 Pa.Cmwlth. 438, 440–442, 466

A.2d 250, 252–253 (1983) (physician's license revoked, *inter alia,* for "fraudulent representations in the practice of osteopathic medicine and surgery" when he fraudulently prescribed drugs for his personal use even though the action did not "affect the care of patients").

The Board was justified in holding that Dr. Banks's conduct posed a threat to patients, not only because a "hospital environment must at all times be conducive to the practice of medicine," but also because his conduct was a threat to the teamwork approach of health care which requires participation from a variety of hospital personnel in order to deliver effective patient care. In fact, the evidence shows that Dr. Banks's conduct affected the working environment so deleteriously that it caused hospital employees to avoid him. For example, witness # 1 testified that she "tried to avoid being around when he [Dr. Banks] was doing his job at the nurses' station." On another occasion, when Dr. Banks and witness # 1 were alone in the kitchen, and when Dr. Banks engaged in the innocuous task of closing the kitchen door, witness # 1 became so "frightened" that she "immediately left" the room. In the Board's charges filed against Dr. Banks, it stated that Dr. Banks's application for privileges was denied, in part, because of the "unwillingness of the nurses [and] victims of his harassment, to allow [him] to return to hospital duties" as well as the "real possibility of a serious moral[e] problem among the hospital's female employees should [Dr. Banks] be granted privileges." Obviously Dr. Banks's misconduct could easily have an adverse effect upon patient care.

██ Dr. Banks suggests that sexual harassment of employees is within the jurisdiction of the employer and the Maryland Commission on Human Relations, and therefore should not be the concern of the Board. *See* Code (1957, 1998 Repl.Vol.), Art. 49B, §§ 14–18. Simply because the Human Relations Commission may also have jurisdiction over a matter, however, is no indication that the matter is beyond the Board's authority. More than one administrative agency can have jurisdiction over a matter. *See, e.g., Insurance Commis-*

*sioner v. Equitable,* 339 Md. 596, 604–605, 664 A.2d 862, 867 (1995); *Equitable Life v. State Comm'n,* 290 Md. 333, 430 A.2d 60 (1981); *Equitable Trust Co. v. State Comm'n,* 287 Md. 80, 411 A.2d 86 (1980).

This Court has emphasized that "sexual harassment in any context is patently unacceptable." *Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 364, 624 A.2d 503, 514 (1993).[4] The Board of Physician Quality Assurance consists of 15 members, 11 of whom must be "practicing licensed physician[s]." *See,* § 14–202(a) of the Health Occupations Article. Certainly the Board has a high degree of expertise in determining what constitutes unprofessional conduct "in the practice of medicine." *Cf. Bd. of Ed. For Dorchester Co. v. Hubbard, supra,* 305 Md. at 787–792, 506 A.2d at 631–634. The Board of Physician Quality Assurance is particularly well-qualified to decide, in a hospital setting, whether specified misconduct by a hospital physician is sufficiently intertwined with patient care to constitute misconduct in the practice of medicine. In light of the deference which a reviewing court should give to the Board's interpretation and application of the statute which the Board administers, we believe that the Board's decision in this case was warranted. When a hospital physician, while on duty, in the working areas of the hospital, sexually harasses other hospital employees who are attempting to perform their jobs, the Board can justifiably conclude

---

4. For a discussion of the prevalence of sexual harassment in the health care industry see Decker, *Sexual Harassment in Health Care: A Major Productivity Problem,* 16(1) Health Care Supervisor 1–14 (1997); Kinard et al., *Sexual Harassment in the Hospital Industry: An Empirical Inquiry,* 20(1) Health Care Management Review 47–53 (1995); Haratami et al., *Legal Medicine for Sexual Harassment of Health Care Workers,* 10(7) HealthSpan 12–13 (1993). In a 1994 nationwide survey of hospitals, results revealed that sexual harassment charges within the health care industry are increasing at an "alarming rate." Kinard, *supra,* at 52. Nearly ¾ of women working in health care reported being sexually harassed. Decker, *supra,* at 3. Nurses and clerical employees filed the greatest number of complaints, Kinard, *supra,* at 51, and nearly 10% of the allegations were brought against physicians. *Id.* at 52.

that the physician is guilty of immoral or unprofessional conduct in the practice of medicine.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY LESTER H. BANKS.*