883 A.2d 943

**David B. METZ, et al.**

v.

**ALLSTATE INSURANCE COMPANY.**

**No. 373, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 20, 2005.

J. Van Lear Dorsey, Ronald Herzfeld, Ellicott City (Kathleen A. Birrane, Erik J. Delfosse, J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellant.

Richard C. Godfrey, Chicago, IL (Bryan D. Bolton, Derek B. Yarmis, Cheryl A.C. Brown, Funk & Bolton, P.A., on brief), Baltimore, for appellee.

Panel: DAVIS, JAMES R. EYLER and KRAUSER, JJ.

KRAUSER, Judge.

In this dispute between an insurance company and one of its former agents, we are asked to decide who owns the agent's book of business or "expirations" for purposes of § 27–503 of the Insurance Article. Enacted primarily to prevent insurance purchasers from losing their coverage when their agent and their company parted ways, this legislation transfers, when that occurs, ownership of the information contained in the agent's book of business to the insurer and then requires the insurer to renew all policies produced by the agent. To off-set the agent's loss of his "expirations," it further requires the insurer, under § 27–503(b)(2), to provide the agent with 90 days' notice of termination and then, under § 27–503(b)(3), to renew the agent's policies, through him or her, for at least two years or until the policies are placed elsewhere. Because the purpose of subsection (2) of § 27–503(b) is to provide the agent with adequate notice of termination and that of subsection (3) is to ensure policy renewal, they are known respectively as the "notice rule" and the "renewal rule."

These rules do not apply, however, when the insurance producer is a "captive agent," that is, an agent who works exclusively for a company or group of companies, whose termination will not interfere with the renewal of any of the policies of his customers, and whose book of business is owned by that entity. As there is no dispute that appellant David B. Metz worked exclusively for appellee Allstate Insurance Company and that the termination of his agreement did not imperil his customers' policies with Allstate, the only issue before us is whether he or Allstate owned his book of business. If he did,

then he was entitled to the protections afforded by the notice and renewal rules; if he did not, then he fell within the "captive agent" exception to the applicability of those two prophylactic provisions.

Determining who owned Metz's expirations is no mean task. Under his contract with Allstate, Metz was professionally neither fish nor fowl, that is to say, neither "captive" nor "independent" agent, but a combination of both. He was one of Allstate's "exclusive independent agents," a company designation which conveys the paradoxical nature of his position. As a "exclusive independent agent," he was both an independent contractor and an exclusive agent, traditionally incompatible positions. He did not "own" his book of business, according to Allstate; yet he had an undefined "economic interest" in it, which he could sell to a buyer approved by Allstate or pledge as collateral for a loan. Indeed, given the novelty and complexity of the parties' business arrangement, it is understandable that the Insurance Commissioner and the circuit court came to different conclusions as to who owned Metz's expirations for purposes of §§ 27–503(b)(2) and (3).

The Insurance Commissioner accepted Metz's claim that he owned his expirations; the Circuit Court for Baltimore City did not. Reversing the Commissioner's decision, the circuit court declared that, under the parties' agreement, the expirations clearly belonged to Allstate and that Metz was therefore not entitled to the statutory benefits he claimed. That ruling was erroneous, claims Metz and the Insurance Commissioner, both of whom are appellants in this matter. Together, they request that we reverse it and remand this case to the circuit court with instructions that it affirm the Commissioner's decision. Individually, Metz requests that further proceedings be held to determine the appropriate amount of damages due him, as a result of Allstate's purported violation of the notice and renewal rules. We decline to grant either request.

## BACKGROUND

Metz's relationship with Allstate began many years before he became one of Allstate's "exclusive independent agents."

In May 1986, Metz joined Allstate, signing an "Agent Employment Agreement." Under that agreement, Metz became a "full-time employee" of Allstate and received a monthly minimum salary and "employment benefits." That agreement also provided, among other things, that Allstate would designate a "sales location" for Metz, determine "all matters relating to its business and [its] operation," and "own all business produced under the terms of the Agreement." It declared that, as an employee, Metz had "no vested interest" in any of the business he might develop on behalf of Allstate.

Almost a decade and half later, to remain competitive, Allstate chose to end its practice of using employees as agents and rely, instead, as its competitors were purportedly doing, on independent agents.[1] For that purpose, it developed an agreement it called the "Allstate R3001S Exclusive Agency Agreement" ("R3001 Agreement"). In July of 2000, Metz signed a copy of that agreement, which incorporated by reference the "Supplement for the R3001 Agreement," Allstate's "Exclusive Agency Independent Contractor Manual," and the "Allstate Agency Standards."

The R3001 Agreement stated, among things, that Metz was now an "independent contractor for all purposes and not an employee," that his "sole compensation" would be commissions, that he would be responsible for running his own agency, including hiring and firing his own employees, setting their salaries, and so on. It also stated that he would have an "economic interest" in his "Allstate customer accounts," which he could pledge as collateral for a loan or sell to an Allstate-approved buyer upon the termination of his relationship with Allstate.

As to who owned the business generated by his agency, the agreement was emphatic, declaring at least three times in nine

---

1. This information comes from *Allstate Insurance Co. v. Office and Professional Employees International Union,* 13RC–20827 (Dec. 2, 2002), a "Decision and Order" from the National Labor Relations Board that is reprinted in the appendix to Metz's brief.

pages, that Allstate owned all of the business produced by Metz for Allstate. And that fact was reiterated in the Allstate manual that accompanied the agreement. The first paragraph of the R3001S Agreement stated that "[t]he Company will own all business produced under the terms of th[e] Agreement"; later, it provided all confidential information including "the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; [and] the expiration or renewal dates of policies . . ." are "wholly owned by the Company." And, still later, it stated that "[a]ny confidential information . . . recorded on paper, electronic data file, or any other medium, whether provided by the Company or by [the agent], is the exclusive property of the Company as is any such medium and any copy of such medium." Moreover, the first paragraph on the first page of The Exclusive Agency Independent Contractor Manual avowed: Allstate "owns all business produced by [its agents]." And consistent with these assertions of Allstate's ownership, the Agreement prohibited Metz from disclosing any "confidential information" to a third party without Allstate's consent and from using that information for a period of one year, following the termination of the Agreement, to solicit the customers he had produced for Allstate.

Less than two years after signing the R3001 Agreement, in a letter dated February 5, 2002, Allstate terminated it, effective June 1, 2002, because of Metz's "continued failure to comply with Allstate Agency Operations Standards." The letter stated that "Allstate w[ould] immediately assume full responsibility for servicing [Metz's] book of business. . . ." It advised Metz that he had "the option of accepting a termination payment from Allstate or selling [his] economic interest in [his] entire book of business to an approved buyer."

After receiving Allstate's letter, Metz filed a complaint with the Maryland Insurance Administration ("MIA"). The allegations of that complaint were summarized in the Insurance

Commissioner's Memorandum of Law and Final order.[2]   According to the Insurance Commissioner, Metz "alleged that: (1) Allstate had unlawfully cancelled its agency agreement with [him]: (2) Allstate [had] unlawfully failed to provide [him] with two years of his customers' policy renewal; and, (3) that Allstate [had] unlawfully prohibited [him] from soliciting, submitting application/or binding policies to Allstate for ninety days following the day that Allstate cancelled its agency agreement with [him]."

At the time he filed his complaint, Metz entered negotiations with his brother, another Allstate agent, to sell his business, including his expirations, to his brother's agency, the "William P. Metz Insurance Agency."   Even though he terminated those negotiations after receiving a favorable ruling from the Associate Insurance Commissioner of Property & Casualty ("associate commissioner"), he nonetheless instructed Allstate to transfer all of his accounts, including the revenue stream, to his brother's agency.   Indeed, According to the Insurance Commissioner, Metz's brother received commissions totaling $28,000 for the months of June, July, August, September, and October, 2002.

Although the associate insurance commissioner concluded that Metz's termination was not "arbitrary, capricious [or] unfair," he ruled that Allstate and Metz "jointly owned the 'business' produced under the Agreement."   He therefore ordered Allstate "to renew through Mr. Metz any policies that have not been replaced by Mr. Metz with other insurers as the expirations occur for a period of two (2) years from the termination date of Mr. Metz's Agreement with Allstate" and "to rescind its February 5, 2002 cancellation notice;  and, if it still chooses to cancel Mr. Metz's Agreement, to issue a new notice providing ninety (90) days in which Mr. Metz may solicit, submit applications, or bind policies for Allstate."   The parties were notified that that order would become final if

---

2.   Metz's MIA complaint does not appear to be part of the record before us.

neither party requested a review hearing within thirty days of its filing date. Both sides did.

At the conclusion of that hearing, the Insurance Commissioner [3] found, as the associate commissioner had, that Metz's termination was not arbitrary, capricious, or unfair. He also agreed with the associate commissioner that Allstate was not the sole owner of the expirations and that, as a result, Allstate had violated Maryland law "by failing to provide Metz with two years' renewal policy expirations and by ... failing to accept new or renewal business from Metz for ninety (90) days after [its] notice of cancellation."

He further found that "no where in the Allstate Agency Agreement does the term expiration appear"; that "the Allstate R3001S Agreement granted Metz more than the right to receive commissions from Allstate"; that Metz was required to maintain a profitable book of business; that the agreement "repeatedly [makes references] to the ownership interest of the R3001 Agent as 'your business' or refers to the sale of 'your agency,' or the sale of the agent's 'book of business'"; that "Allstate does not assist in the valuation or the sale of the agent's interest in his business"; that "the terms of any sale are negotiated between the buying and selling agents"; and that an agent's interest may be pledged as collateral for a loan.

Although he made many of the same findings as the associate commissioner, the Insurance Commissioner granted Metz different relief: He ordered Allstate to pay restitution to Metz in the amount of the commissions due on policy renewals for a period of two years from the termination of Metz's agency agreement.

Mutually dissatisfied with that order, the parties filed cross-petitions for judicial review in the Circuit Court for Baltimore City. While Metz claimed that the Insurance Commissioner

---

**3.** The Associate Deputy Commissioner, on behalf of the Insurance Commissioner, presided at the hearing. He thereafter signed, on behalf of the Commissioner, the Memorandum of Law and Final Order which was issued after that hearing.

erred in "failing to order Allstate to reinstate [him] as an Allstate agent for ninety (90) days and to 'renew' insurance policies through [him] for two (2) years[,]" Allstate alleged that he erred in finding that Allstate had violated Maryland law and in ordering restitution. The circuit court agreed with Allstate and reversed the Insurance Commissioner's decision to the extent it found that Allstate had violated Maryland law, specifically §§ 27–503(b)(2) and (3), in terminating Metz's agreement.

The circuit court explained that the R3001 Agreement's references to "confidential information" were actually references to what are known, in the insurance business, as "expirations" and that information, the Agreement repeatedly avowed, was the property of Allstate. And there were more indicia of Allstate's ownership, the court asserted, pointing specifically to the non-disclosure and the non-competition provisions of the agreement. Under the former, Metz was prohibited from disclosing any information regarding the business he generated for Allstate to a third party without Allstate's approval, and, under the latter, he was prohibited from soliciting Allstate's customers, including those he had produced for Allstate, for a period of one year following his termination.

The circuit court dismissed Metz's claim that his "economic interest" in his book of business constituted ownership under § 27–503(b)(ii)(2), stating that "[a]lthough Metz had an 'economic interest' in the book of business written under the Agreement, Allstate clearly owned the book of business, or the expirations." It further observed that, although Metz could transfer this information to a buyer, such a transfer could only occur with Allstate's approval and then only if the transferee agreed to be bound by the provisions of Metz's contract. "[J]ust because the contract provided that Metz could use and transfer his right to use the expirations to another producer, Allstate did not," the court opined, "lose ownership of the expirations." That information, the court declared, was "at all times . . . wholly owned by Allstate."

### DISCUSSION

### I.

Appellants contend that the circuit court erred in reversing the Maryland Insurance Commissioner's finding that Allstate violated § 27–503 of the Insurance Article, when it failed to comply with the "notice" and "renewal" rules of that statute in terminating Metz's contract. Compliance with those rules is required when the agent to be terminated owns his expirations; when he does not, he falls within the captive agent exception of that statute and no such compliance is necessary. Were it otherwise, the insurer would, in effect, be required by law to compensate a former agent for expirations that it, not he, owns.

Finding that Allstate, not Metz, owned the "expirations," the circuit court held that Allstate was not required to give Metz 90 days' notice of his termination, under the "notice rule" of § 27–503(b)(2), or to renew policies that Metz was unable to place with other companies, under the "renewal rule" of § 27–503(b)(3). It therefore reversed the decision of the Insurance Commissioner.

But it is not the circuit court's decision that we review. It is the agency's. *Annapolis Mkt. Place, L.L.C. v. Parker*, 369 Md. 689, 703, 802 A.2d 1029 (2002) (citation omitted) In so doing, our role " 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and . . . if the administrative decision is premised upon an erroneous conclusion of law.' " *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376 (1999)(quoting *United Parcel v. People's Counsel*, 336 Md. 569, 576, 650 A.2d 226 (1994)). Applying that standard, we turn to appellants' contentions.

Appellants assert that Allstate did not exclusively own Metz's expirations, but shared ownership with Metz. Metz's agreement with Allstate, they point out, granted Metz an "economic interest" in his "book of business," which he could either sell to an Allstate-approved buyer or accept a termi-

nation fee from Allstate, based upon the value of the expirations. That arrangement, they claim, made Metz and Allstate co-owners of the expirations, placing Metz within the protective scope of the notice and renewal rules.

Section § 27–503(b)(2) or the "notice rule" states:

If an insurer intends to cancel a written agreement with an insurance producer or intends to refuse a class of renewal business from an insurance producer, the insurer shall give the insurance producer at least 90 days' written notice.

Md.Code (1957, 2002 Repl. Vol), § 27–503(b)(2) of the Insurance Article ("Ins.").

And Section 27–503(b)(3) or the "renewal rule" provides:

Notwithstanding any provision of the agreement to the contrary, the insurer shall continue for at least 2 years after termination of the agency agreement to renew through the insurance producer any of the policies that have not been replaced with other insurers as expirations occur.

Ins. § 27–503(b)(3).

Thus, those two rules require an insurer to give an agent, which it wishes to terminate, 90 days written notice of that termination, and then, upon termination, to renew for at least two years, through that agent, any policies that have not been placed with other insurers. There are, however, two exceptions to the 90 day notice obligation of § 27–503(b)(2) and the two year renewal requirement of Ins. § 27–503(b)(3), which relieve the insurer of having to comply with either. They are the "lines of business exception" and the "captive agent exception."

The lines of business exception provides that the notice and renewal rules do not pertain to "policies of life insurance, health insurance, surety insurance, wet marine and transportation insurance, and title insurance[.]" Ins. § 27–503(b)(i)(1). That exception does not apply here, nor do the parties contend otherwise. The policies Metz wrote were for property and casualty insurance, not "for life insurance, health insurance,

surety insurance, wet marine and transportation insurance, and title insurance."

But the applicability of the captive agent exception cannot be so easily dismissed. Indeed, that exception is the fulcrum of this case. It provides that the notice and renewal rules do not apply to:

(ii) insurance producers or policies of a company or group of companies represented by insurance producers who by contractual agreement represent only that company or group of companies if:

1. the business is owned by the company or group of companies; and

2. the cancellation of any contractual agreement does not result in the cancellation or refusal to renew any policies.

Ins. § 27–503(b)(1)(ii).

The parties agree that the nature of Metz's agency satisfied two of the three criteria of the captive agent exception: Metz "by contractual agreement represented only" Allstate, as required by Ins. § 27–503(b)(1)(ii), and the "cancellation of [Metz's] contractual agreement d[id] not result in the cancellation or refusal to renew any policies," as required by Ins. § 27–503(b)(1)(ii)(2). Thus, in determining whether the captive agent exception applies here, the only question that remains is whether "the business [was] owned" by Allstate, as required by § 27–503(b)(1)(ii)(1). If Allstate did own the business, then Metz was not entitled to the protections afforded by the notice and renewal rules.

Neither § 27–503, in particular, nor the Insurance Article, in general, provides any guidance as to what the words "business" and "own" mean in the phrase "the business is owned by the company." Fortunately, the Court of Appeals does, at least as to the meaning of "business." The term "business," the Court has indicated, refers to the agent's "expirations." *Lincoln Nat'l Life Ins. Co. v. Ins. Comm'r*, 328 Md. 65, 76, 612 A.2d 1301 (1992). And the term "expirations" refers to the " 'records containing the date of the insurance policy, the name of the insured, the date of its expiration, the

amount of insurance premiums, property covered and terms of insurance.'" *Travelers Indem. Co. v. Merling,* 326 Md. 329, 337, 605 A.2d 83 (1992) (quoting *V.L. Phillips & Co. v. Pennsylvania Threshermen, Etc.,* 199 F.2d 244, 246 (4th Cir. 1952)). Indeed, expirations provide an insurance agent or company with the information needed to contact an insured prior to termination of a policy and offer an opportunity to renew the policy. *Merling,* 326 Md. at 337, 605 A.2d 83.

Given this definition of expirations, the circuit court did not err, as appellants contend, in finding that the "confidential information" mentioned in the R3001 Agreement referred to Metz's "expirations." The R3001 Agreement stated that "[c]onfidential information includes, but is not limited to: . . . information regarding the names, addresses, and ages of policyholders of the Company; types of policies, amounts of insurance; premium amounts; the description and location of the insured property; the *expiration or renewal dates of policies* . . . ." Consequently, as the circuit court observed, "[a] comparison of the definition of 'confidential information' under the agreement and 'expirations' as defined by the Court of Appeals in *Merling* makes clear that they are the same."

■ In the absence of a contractual provision attributing ownership of the expirations to one party or the other, this asset, under a trade custom and practice known as the "American Agency System," belonged to the agent. *Merling,* 326 Md. at 337–38, 605 A.2d 83. In accordance with that custom and practice, "if an insurance company terminated an agent, the company was prohibited from interfering with the agent's property right in the expirations. This meant that the company could not use the expirations to directly solicit the insureds or to refer them to other agents who represented the [same] company." *Merling,* 326 Md. at 338, 605 A.2d 83. Unfortunately, "[t]he result was that, upon termination of the agent, a majority of the policies which originated from the agent were not renewed." *Id.*

But this was hardly the only problem generated by a strict application of the American Agency System. It permitted, or

at least did not prevent, insurers from engaging in arbitrary and discriminatory practices such as "'redlining', whereby insurers would refuse to renew or write policies based on the geographic area in which the insureds or applicants lived." *Merling,* 326 Md. at 339, 605 A.2d 83. Because, under the American Agency System, the expirations were exclusively the agent's, the insurer could rid itself of less economically rewarding business, by simply terminating its relationship with the representing agent, leaving its former insureds unprotected when their policies expired. *See Id.* at 340, 605 A.2d 83.`

That led to a series of enactments beginning in 1970, which, in effect, amended the American Agency System by transferring an ownership interest in the agent's expirations to the insurer, by requiring the insurer to renew the policies of the agent's customers and by providing the agent, in return, the opportunity to, among other things, place his customers with other insurers and collect commissions, for two years, on policies of customers he could not. In sum, these enactments were intended to protect both the insureds and their agents from arbitrary, capricious, or discriminatory practices of the insurer. *Id.* at 340, 605 A.2d 83.

The Court of Appeals described the first legislative change in 1970 and the reasons for it as follows:

By Ch. 417 of the Acts of 1970, the General Assembly added §§ 234A, 234B and 234C to the Insurance Code, Art. 48A. Section 234A was enacted to prohibit insurance companies from engaging in numerous underwriting practices deemed arbitrary or discriminatory, including the practice of what is called "redlining,"... Section 234A, inter alia, required insurers to renew existing policies unless the insurers could demonstrate certain economic or business reasons for the refusal to renew. Section 234B protected insurance agents from arbitrary or discriminatory termination by insurers. Section 234C granted to the Insurance Commissioner the power to order an insurance company either to accept the risk of an insured or the business from an agent

if the Commissioner finds a violation of either § 234A or § 234B.

*Merling,* 326 Md. at 339–40, 605 A.2d 83.

Those legislative changes did not, however, fully achieve their purpose. The American Agency System still prevented insurance companies from using the expirations of a terminated agent to renew the policies of insureds. *Id.* at 340, 605 A.2d 83. That prohibition meant that "when an agent in a particular geographic area was terminated for a legitimate reason, the effect was that the insurance policies of that agent's clients were not renewed" by the insurer. *Id.*

Two years later, the legislature attempted to solve that problem as follows:

By Ch. 73 of the Acts of 1972, the General Assembly amended § 234B so that a compromise was reached between the agent's right to his expirations following termination and the State's interest in protecting the insureds from cancellations or nonrenewals. As amended in 1972, the statute guarantees that the policies produced by the agent will be renewed through the agent for one year following the agent's termination. The statute also permits the agency agreement to set forth a longer period.

Thus, the agent is given the benefit from his expirations for at least a year after termination; he is guaranteed at least a year's worth of renewal commissions. During that year the agent may ... place his clients with other insurance companies or broker his clients through another agency. The agent may also sell his expirations outright to another agency, as they are a marketable asset. At the end of that one year period, or whatever longer period might be set forth in the agency agreement, the insurance company is required by § 234B to renew the policies of those insureds who decide to stay with the company, unless there exist valid grounds for nonrenewal other than the termination of the agent. Section 234B(c) states: "No insurer shall cancel or refuse to renew the policy of the insured because of the termination of the agent's or broker's contract."

Section 234B(c), therefore, requires the insurer to use the former agent's expirations to renew the policies of those insureds choosing to remain with the insurer. The statute obviously modifies an agent's property right in his expirations.

*Merling*, 326 Md. at 340–41, 605 A.2d 83.

But "Chapter 73 of the Acts of 1972" needed further refinement as insurers were required, under that act, to comply with the notice and renewal rules, regardless of the nature of the insurance that was sold or their relationship to the selling agent. To modify the overreach of these two rules, in 1975, the captive agent exception and the lines of business exception were added. *Lincoln National*, 328 Md. at 75, 612 A.2d 1301.

Explaining the reasons for that addition, The Court of Appeals stated:

The evident purpose of the 1975 amendment was to narrow the scope of the notice rule and of the renewal rule. Although the rules were intended to be limited to property and casualty agents and brokers who owned their expirations, the language employed was broader than the objective. By stating two absolute rules which were limited only by the lines of business exception, the two rules also applied to agents and brokers who were employees of property and casualty insurers, e.g., the direct writers, but who did not own their expirations. Captive agents simply were not part of the problem that the General Assembly sought to address, and they were excepted as well.

*Id.* at 76, 612 A.2d 1301.[4]

Thus, the purpose of this legislative scheme from its inception in 1970 was to protect insureds from "arbitrary or discriminatory" practices, such as "redlining," and insurance agents "from arbitrary or discriminatory terminations by insurers." The two amendments that followed sought to remedy the inequities of the original legislation, without compro-

---

4. In 1997, the General Assembly changed the one year renewal provision to the current two year provision. 1997 Md. Laws 519.

mising its purpose: The 1972 amendment created a procedure to compensate the agent for the losses he or she might suffer from the transfer of his or her expirations to the insurer, and the 1975 amendment corrected the overreach of the 1972 amendment, by narrowing the scope of the notice and renewal rules that amendment promulgated.

But the legislation does not serve that purpose here. Appellants do not claim, on appeal, that Metz's contract was arbitratorily or discriminatorily terminated.[5] In fact, they do not claim that the contract was unfair in any respect, not even its termination provisions. And, while Metz's contract with Allstate provided a means to compensate Metz for the work he had produced before his contract was terminated by giving him the right to sell an undefined "economic interest" in book of business, it clearly established that Allstate owned Metz's expirations at its beginning, middle, and end. Earlier on, the R3001 Agreement stated that "[t]he Company will own all business produced under the terms of th[e] Agreement"; and then, later, that all confidential information including "the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; [and] the expiration or renewal dates of policies ..." is "wholly owned by the Company"; and still later, that "[a]ny confidential information ... recorded on paper, electronic data file, or any other medium, whether provided by the Company or by you, is the exclusive property of the Company as is any such medium and any copy of such medium." Making the same point, the Allstate agency manual, which was incorporated by reference into the R3001 Agreement, began with the statement that Allstate "owns all business produced by" its agents.

The agreement also prohibited Metz, upon the termination of his contract, to use the expirations or to let anyone else use them, without Allstate's permission. And, finally, Metz and

---

**5.** That omission is understandable, as that claim was rejected at all levels of review before reaching this Court.

Allstate agreed, in the R3001 Agreement, as to what would occur and as to what Metz would be entitled to upon its termination. Thus, Metz agreed to accept a termination fee or the compensation he would receive from the transfer of his interest to an Allstate-approved buyer in lieu of the benefits conferred by the notice and renewal rules. The notice and renewal rules kick-in when expirations are taken from an agent, in accordance with the mandate of § 27–503, and given to the insurer, not when the agent does not own them in the first place, having contractually transferred whatever ownership claim he had in them to the insurer as a part of the bargain the parties had struck at the inception of their relationship.

The insurer and its agents are free to negotiate the terms of their contractual relationship, including who owns the expirations. Nothing in the legislative history of § 27–503 or its language suggests that they are not. Nor is it the purpose of that statute to protect an agent from the terms of a lawful agreement that he or she has voluntarily entered into with an insurer. Indeed, when the legislative purpose of Ins. § 27–503 of protecting insureds is addressed in a contract between insurer and agent, by assigning ownership of the expirations to the insurer at the outset, as occurred here, the insurer and agent are free to agree to any terms which they feel meet their respective needs and goals.

Appellants claim that, by framing the R3001 Agreement as it did, Allstate was trying to get around the notice and renewal rules and that it should not be rewarded for clever drafting. If Allstate was engaged in "clever drafting," it was not for the purpose of avoiding having to pay commissions, as it had agreed that Metz could sell his expirations to an approved-buyer. And, in fact, he was in the process of doing precisely that when he obtained a favorable decision from the associate commissioner. After receiving that decision, he suspended negotiations with Allstate but not before directing it to transfer his accounts and revenue stream to the potential purchaser of his expirations—his brother and fellow Allstate agent, William Metz. And that, to at least some extent, did occur. As

the Insurance Commissioner noted in his decision, the William P. Metz agency received commissions totaling $28,000 for the months of June, July, August, September, and October, 2002.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**