873 A.2d 1145

MARYLAND AVIATION ADMINISTRATION

v.

Clifton F. NOLAND.

No. 15, Sept. Term, 2003.

Court of Appeals of Maryland.

May 10, 2005.

Maureen M. Dove, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Andrew H. Baida, Asst. Atty. Gen., Louisa H. Goldstein, John C. Bell, Asst. Atty's Gen., on brief), for petitioner.

Dennis Gottesmann (Law Offices of Dennis M. Gottesmann, P.A., Greenbelt, on brief), for respondent.

Argued before BELL, C.J., ELDRIDGE *, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

Opinion by ELDRIDGE, J.

This is an action for judicial review of an adjudicatory administrative decision terminating the employment of a state governmental employee. The Circuit Court for Anne Arundel County, while accepting the administrative findings of fact as being supported by substantial evidence, reversed the administrative decision on the ground that the termination sanction for the employee's misconduct was "arbitrary." The Court of Special Appeals, in an unreported opinion, affirmed. Both courts relied upon an earlier Court of Special Appeals' case, *Maryland State Retirement Agency v. Delambo*, 109 Md.App. 683, 675 A.2d 1018 (1996). We shall reverse, shall direct that the administrative decision be affirmed, and shall overrule *Maryland State Retirement Agency v. Delambo, supra.*

## I.

The respondent Clifton F. Noland was a paramedic employed by the Maryland Aviation Administration, which is a unit of the Maryland Department of Transportation. The basic facts concerning Noland's employment history and the incident leading to his termination were undisputed. They are set forth in the opinion of Administrative Law Judge (ALJ) Sharonne R. Bonardi as follows:

### *"FINDINGS OF FACT"*

"Having considered the evidence presented, I find the following facts by a preponderance of the evidence:"

"1. At all times relevant to this proceeding, the Employee [Clifton F. Noland] was employed as an Airport Ad-

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

vanced Life Support Provider with the Maryland Aviation Administration."

"2. The Employee began employment as an Airport Advanced Life Support Provider on December 14, 1988. During the period 1989–1992, in a range of superior, satisfactory, and unsatisfactory, the Employee received satisfactory on his performance evaluations. In 1993 and 1994, he received superior ratings. From 1995–1998, in a range of far exceeds, exceeds, meets, below, and far below, the Employee received an exceeds standards rating."

"3. On May 1, 1997, THRS [Transportation Service Human Resources System of the Maryland Aviation Administration] issued a Workplace Violence policy. On November 6, 1997, the Employee signed an Employee Acknowledgment Receipt acknowledging that he received a copy of TSHRS Workplace Violence policy and was required to familiarize himself and comply with that policy as a condition of employment."

"4. On March 30, 1999, the Employee and Paramedic James Clopein were working the 'D' shift within the Fire Rescue and Safety unit at the Baltimore Washington International ('BWI') Airport. At 12:21 a.m., the Consolidated Dispatch Center ('CDC') received a call from Police Officer Reed, Maryland Transportation Authority Police ('MTA') requesting an ambulance to assist in transporting a combative psychiatric prisoner ('Patient') to the North Arundel Hospital. The CDC immediately dispatched a two-member paramedic team consisting of the Employee and Paramedic Clopein."

"5. Before entering the MTA police station, both the Employee and paramedic Clopein placed latex gloves on their hands and then took a stretcher and portable radio into the police station."

"6. The police officers informed the paramedics that the combative patient was spitting and drinking water from the toilet in his cell."

"7. The Employee returned to the ambulance to retrieve protective face shields. He located two face shields in the vehicle and brought them back to the police station."

"8. When the Employee returned to the police station, the police officers opened the cell to remove the Patient. As the police officers were opening the cell, the Patient spit fluid onto one of the police officer's face, neck, and chest."

"9. The Employee and Paramedic Clopein requested that the Patient be placed face-down on the stretcher. The police officers restrained the Patient with handcuffs and placed the Patient on his back onto the stretcher rather than face-down as requested. The Employee placed a face shield onto the Patient. Both the Employee and Paramedic Clopein strapped the Patient to the stretcher, and with the assistance of the police officers, began carrying the patient from the police station."

"10. The Patient, while spitting and screaming 'f—you' and other expletives, dislodged the face shield and spit at the Employee. The Patient also threatened to kill the Employee, Paramedic Clopein, and the police officers present. The Employee struck the Patient in the face with closed fist and then reattached the face shield onto Patient's face. The police officers and Paramedic Clopein observed the blow to the Patient's face and made no comments regarding the Employee's actions."

"11. The Employee and Paramedic Clopein exited the police station and were pushing the stretcher to the ambulance when the Patient again dislodged the face shield and spit at the Employee. The Employee once again hit the Patient in the face with a closed fist and reattached the face shield onto the Patient's face. Paramedic Clopein observed the hit. A police officer was also present when the Employee struck the Patient this time as well."

"12. During the incident, the Employee had a portable radio in one hand but never used the radio to strike the Patient."

"13. Both hits were with the Employee's closed fist and neither caused bruising, swelling, or any other visible injury to the Patient."

"14. The blows were to prevent the Patient from spitting and to protect the police officers and the paramedic team from possible exposure to a communicable disease."

"15. The Employee, Paramedic Clopein, and a police officer transported the Patient to North Arundel Hospital without further incident."

"16. The Employee and Paramedic Clopein did not report the incident to the North Arundel Hospital staff."

When Noland and Clopein returned to BWI, Clopein, as the non-driving paramedic and pursuant to established internal agency practice, completed and filed a Maryland Ambulance Information System Report and a BWI Fire and Rescue Service Report, but, as found by the ALJ, he "did not include any statements regarding the Employee's act of twice striking the Patient." In addition, upon returning from the Hospital to BWI, Noland and Clopein failed to report Noland's act of twice striking the patient either to the Emergency Medical Services (EMS) Coordinator, or to the Shift Supervisor, or to the Shift Commander.

The ALJ further found that, later in the day of March 30, 1999, "Paramedic Clopein described the incident to Paramedic Fayer, the EMS Coordinator, and informally asked if the incident should have been reported. Paramedic Fayer informed Paramedic Clopein that he should have reported the incident. Paramedic Fayer immediately informed Francis Jester, Division Fire Chief, . . . of the incident, and Fire Chief Jester advised Paramedic Fayer to obtain written statements from both the Employee and Paramedic Clopein and forward the reports to the shift commander." Noland completed his report on April 3, 1999, and submitted it to Paramedic Fayer and the Division Fire Chief on the same day. Clopein completed and submitted his report on April 15, 1999.

According to the ALJ's findings, "[a]ll BWI paramedics and emergency medical personnel operate under the medical li-

cense of Dr. Phillip Phillips, BWI, FRS Medical Director." Dr. Phillips was informed of the striking incident on April 15, 1999, and, that same day, suspended Noland from operating under Dr. Phillips's medical license. On the next day, the Maryland Institute of Emergency Medical Services System suspended for one year Noland's paramedic license for twice striking the patient. Also on April 16, 1999, the BWI Airport Fire Department began an investigation of the incident. The investigation was competed on April 20, 1999, and Clopein was suspended without pay for five days for failing to report the incident. Noland, on April 22, 1999, was suspended without pay pending the disposition of charges for his termination as an employee with the Maryland Aviation Administration. Following the completion of the investigation, Noland was informed on July 2, 1999, that charges for termination of his employment and disqualification for future employment with the Maryland Aviation Administration, based upon his striking a patient twice and failing to report the incident, had been filed against him.

Noland filed a timely appeal to the Maryland Office of Administrative Hearings, and a hearing was held before ALJ Bonardi on January 27, 2000, and continued on March 6, 2000. The ALJ on April 20, 2000, filed an extensive opinion containing findings of fact as summarized above, conclusions of law, and a proposed decision. The ALJ concluded that Noland did not violate "Management's Workplace Violence Policy" because "he did not strike the Patient out of anger, but rather to prevent or reduce possible exposure to an infectious disease," and that his "actions were not done for the purpose of intimidation, or for the purpose of harming, damaging, or causing injury to persons or property." [1] ALJ Bonardi, after

---

1. The ALJ described the Workplace Violence Policy, which Noland received in 1997, as follows:

"The policy states that all employees have the right to work in an environment that is free from harassment, threats, intimidation, or violence. (7L1.1.) It is the policy of the Department that such behavior, in any form, will not be tolerated in the workplace or in connection with employment. (7L1.2.) The policy defines violence or

a detailed review of COMAR regulations, the "Manual of Maryland Medical Protocols for Cardiac Rescue Technicians and Emergency Medical Technicians–Paramedic," and the expert testimony at the hearing, further concluded as follows:

"I conclude as a matter of law that the Employee used excessive force when twice striking the restrained Patient. COMAR 11.02.08.06B(10). I also find as a matter of law that in striking the Patient and failing to report the incident, the Employee violated a written policy and committed an act of misconduct and that act could have caused loss or injury to the State. COMAR 11.02.08.06B(6), COMAR 11.02.08.06B(8), COMAR 11.02.08.06B(12). Those charges are therefore sustained."

With regard to the appropriate sanction, the ALJ recommended a suspension rather than termination of Noland's employment, stating:

"Management can terminate an employee for conduct amounting to one or more of the enumerated causes for termination. COMAR 11.02.08.06B. Management has established that the Employee has violated three (3) of the six (6) causes of termination set forth above. Thus, the Management has met its burden of persuasion and can terminate the Employee. The Employee argues that Management should apply its progressive discipline policy and not impose the termination. Management counter-argues that progressive discipline is discretionary. Management is correct that it is not required to implement the Progressive Discipline Policy ('Policy 7G') (Emp. Exhibit 6.) The policy states that in some cases a particular form of discipline may be bypassed depending on the severity or number of violations, documentation, or the employee's work history. (7G 4.3) After Chief Allen met with Employee Relations and the MAA Attorney general, Management concluded that the

a violent act as a physical force or verbal abuse exerted for the purpose of intimidation, or for the purpose of harming, damaging, or causing injury to persons or property. (7L3.5.) During the course of employment with the Department, no employee shall commit any violent act against any person. (7L4.1)"

Employee's actions were so severe that termination was warranted."

\* \* \*

"The Employee has not been disciplined for any reason in the past years while employed by the MAA. The Employee has received 'superior' or 'exceed standards' in his perform- ance evaluations since 1993. Also, Chief Pace testified that after completing the investigation, he orally recommended that the Employee be suspended for thirty days. In consid- ering the Employee's action, his work history, and the recommendation of the Investigator Chief Pace, the Em- ployee's Motion to Modify the Penalty of Termination is **GRANTED.** I propose that the appropriate sanction is to suspend the Employee without pay. The period of suspen- sion began April 22, 1999 and continues until the Employ- ee's paramedic license is reinstated by MIEMSS."

The Maryland Aviation Administration filed, with the Secre- tary of the Department of Budget and Management, excep- tions to the ALJ's proposed decision, and the exceptions were considered by a designee of the Secretary who rendered an opinion and a final administrative decision on July 27, 2000. The designee "adopt[ed] the 41 findings of fact the ALJ made" and "sustained" the ALJ's conclusions of law with one "excep- tion." The "exception" was that the designee concluded that Noland's actions constituted a violation of the "Management's- Workplace Violence Policy." The designee explained:

"The Maryland Aviation Administration ... filed an ex- ception to the ALJ's conclusion that the employee did not violate the employer's workplace violence policy. The ALJ read into the policy the requirement that someone must act out of anger to violate the policy, and in this case the employee was concerned for his safety and did not act out of anger. Consequently, in the view of the ALJ, the employee did not violate the policy. However, I disagree, as a matter of law, with the reasoning of the ALJ. Striking a restrained and handcuffed patient with a closed fist is not acceptable, and is an unjustified act of violence. The trouble in the

ALJ's reasoning lies in the fact that someone may be motivated by fear, yet his actions could still be intimidating, harming or damaging. The fact that Mr. Noland twice struck the patient with a *closed* fist[2] leads to the inference that while one of the purposes was to stop the patient from spitting, the means of doing so was to intimidate the patient, through the escalation of the event from a verbal warning to the introduction of force, to get him to stop spitting. *See* footnote 2, *supra.* Indeed, the ALJ elsewhere found that the striking of the employee was an unwarranted and excessive use of force. ALJ proposed opinion, page 19. Hence, because the use of force was unwarranted and excessive, the policy on workplace violence also was violated."[3]

\* \* \*

"[2] In his incident report, admitted as part of MAA exhibit # 4, Mr. Noland said that he twice 'struck' the patient on the lower jaw and that he first told the patient not to spit any more. When the verbal warnings failed, force was introduced."

"[3] Even assuming for the sake of argument that the workplace violence policy was not violated, the other violations, found by the Administrative Law Judge are sufficient to support Mr. Noland's termination. In other words, the ultimate conclusion of this opinion would be the same."

The Secretary's designee disagreed with the ALJ's recommended sanction, saying (footnote omitted):

"Penalty determinations are judgment calls within the discretion of the employing agency. We will not disturb a choice of penalty within the agency's discretion unless the severity of the agency's action appears unwarranted in light of all factors. That choice does not appear unwarranted here."

"I recognize that Mr. Noland's performance was satisfactory or better, and indeed exceeded standards in recent years. It was uncontested that Mr. Noland had a good overall history, had a good attendance record, had a good disciplinary record, had good work habits, and got along well with his co-workers. It is clear that all of these factors

are in his favor. However, they do not outweigh the severity of what he did."

"It was the testimony of Dr. Phillips that it is never warranted to strike a patient. Chief Allen said the same thing. While Noland's record was unquestionably good, and would mitigate ordinary misconduct, what management in effect was saying was that even a stellar record was irrelevant based on the facts of the incident. (For similar reasons, management chose not to impose progressive discipline: it concluded that the offense was serious enough to warrant immediate termination.)"

\*      \*      \*

"Indeed, the actions were severe enough so that Mr. Noland's license was suspended for a year by the Maryland Emergency Medical Service Systems. In the State Personnel Management System statute 'wantonly careless conduct or unwarrantable excessive force in the treatment or care of an individual who is a client, patient, prisoner, or any other individual who is in the care or custody of this State' is a cause for *automatic* termination. State personnel and Pensions Article § 11–105(8). The statute is a legislative recognition of the severity of this type of misconduct, which no mitigating factors can outweigh, and in which termination should be automatic. It also makes it clear that it is not unreasonable, arbitrary or capricious for management to terminate for conduct of that nature."

\*      \*      \*

"I also have given my own consideration to the factors specified in [*Maryland State Retirement Agency v.] Delambo.* Unquestionably, each of the five factors weighs in Mr. Noland's favor. However, the stubborn fact remains that he twice struck a restrained and handcuffed medical patient, with unwarranted and excessive force. This is not outweighed by the five *Delambo* factors. In this case, a reasonable employer could impose the punishment imposed. The punishment fits the crime, and it is clear that the employee was not punished simply because he could be

punished: he was terminated for extreme misconduct. None of the alternative sanctions would have been appropriate." [2]

A final administrative order was filed separating Noland from his position at the Maryland Aviation Administration and disqualifying him from future employment with the Administration.

Noland filed in the Circuit Court for Anne Arundel County, pursuant to the Maryland Administrative Procedure Act, Maryland Code (1984, 2004 Repl.Vol.), § 10–222 of the State Government Article, a petition for judicial review. Following a hearing, the Circuit Court reversed the administrative decision and remanded the case for further administrative consideration of the appropriate sanction. The reversal was not based upon a judicial holding that any of the administrative findings of fact were unsupported by substantial evidence. Furthermore, the Circuit Court did not hold, as a matter of law, that Noland was not guilty of any misconduct. (Such a legal holding, in light of the administrative record and the applicable regulations, would not be sustainable). Rather, the Circuit Court's decision was largely based upon the Court's view that, in determining the appropriate sanction, the Secretary's designee gave insufficient consideration to what the court believed were substantial mitigating factors.

Thus, according to the Circuit Court, because Noland "was working with the police and came to the scene at the request of the police, he should be afforded similar protection under the law as to the use of force," and that this was a "factor that

---

**2.** Prior to this discussion of the *Delambo* factors, the Secretary's designee dealt with a legal issue which had been raised concerning the scope of the *Delambo* case, and particularly whether it applied to the type of misconduct here involved. Although the designee indicated that, in his view, *Delambo* was inapplicable, the designee in the above-quoted paragraph alternatively proceeded on the assumption that *Delambo* was applicable. Both the Circuit Court and the Court of Special Appeals discussed this issue and took the position that *Delambo* applied to the type of misconduct of which Noland was guilty. We need not explore the issue relating to the scope of *Delambo*. Since we shall overrule *Delambo*, the question is moot.

should have, at the very least, been considered in mitigation." In ascertaining the "similar protection under the law as to the use of force," the Circuit Court relied on language from *State v. Pagotto*, 361 Md. 528, 762 A.2d 97 (2000), a case dealing with the sufficiency of the evidence to sustain a police officer's criminal convictions for involuntary manslaughter and reckless endangerment. The Circuit Court also relied on language from a Supreme Court opinion, cited in *Pagotto*, concerning whether alleged excessive force by a police officer violated the Fourth Amendment.

Furthermore, the Circuit Court indicated that the Secretary's designee failed to give sufficient weight to the mitigating factors that Noland "was acting in self defense and the defense of others," which "are recognized defenses in Maryland which may excuse even criminal offenses." In addition, the Circuit Court stated that "this court finds arbitrary the Secretary's apparent premise that it *always* will constitute unwarranted and excessive force if an individual is struck with a *'closed* fist.'" (Emphasis in original). While acknowledging that the Secretary's designee purported to have considered all of the factors set forth in *Maryland State Retirement Agency v. Delambo, supra*, the Circuit Court obviously disagreed with the weight which the designee had given to such factors. The court stated:

> "Nonetheless, he [the Secretary's designee] found no grounds to mitigate or reduce the maximum punishment—termination of employment. This peremptory dismissal of all factors in Petitioner's favor, again, appears arbitrary and must be reversed. The Secretary is required to weigh the seriousness of Petitioner's momentary, highly mitigated, and minor infraction, which caused no injury to anyone and served the apparent needs of public safety and law enforcement, against his 11 years of prior exemplary service. In this proper legal context and given the Secretary's approval of prior fact-finding, it is difficult to understand how the ultimate sanction of termination could be appropriate."

The Maryland Aviation Administration appealed to the Court of Special Appeals which, in an unreported opinion,

affirmed the judgment of the Circuit Court. The intermediate appellate court began its opinion by pointing out that "[j]udicial review of an agency's factual findings does not permit the Court to make an independent decision on the evidence." The appellate court then continued: "[o]n the other hand, 'when reviewing issues of law, ... the court's review is expansive and it substitutes its judgment for that of the agency,'" quoting prior Court of Special Appeals' opinions. The Court of Special Appeals then relied upon its earlier opinion in *Maryland State Retirement Agency v. Delambo, supra,* saying:

> "In *Maryland State Retirement Agency v. Delambo,* 109 Md.App. 683, 675 A.2d 1018 (1996), this Court stated that before an agency can terminate an employee from his or her employment, that agency must take into consideration the employee's (1) overall employment history in State service, (2) attendance record during that period of time, (3) disciplinary record at the present agency and at other State agencies as well, (4) work habits, and (5) relations with fellow employees and supervisors. *Id.* at 691, 675 A.2d 1018. *Delambo* also held that '[t]he agency must prepare findings of fact and conclusions of law that are adequate for judicial review....'"

> \*     \*     \*

> "We recognize that ... the Secretary stated that he proceeded to take the *Delambo* factors into consideration before terminating appellee's employment and that those factors did not outweigh the seriousness of appellee's conduct. We hold, however, that one sentence stating that appropriate consideration was given to those factors is not adequate to permit meaningful judicial review."

Like the Circuit Court, the Court of Special Appeals characterized the Secretary's position as being "that striking a patient with a closed hand will automatically constitute both unwarranted and excessive force," and the appellate court stated that, while it may "always be unwarranted conduct for a physician or a paramedic to strike his or her patient, that

does not mean that the force is always excessive under the circumstances, especially where that individual is acting in self-defense."

In the Court of Special Appeals, the Maryland Aviation Administration had relied on *MTA v. King,* 369 Md. 274, 799 A.2d 1246 (2002). This Court in *King* held, *inter alia,* that judicial review of an adjudicatory administrative decision disciplining a state governmental employee for misconduct, where the sanction imposed was lawful and authorized, does *not* encompass review to determine whether the sanction was " 'disproportionate to the offense' " or "disproportionate to [the employee's] misconduct" or an "abuse of discretion" unless "the disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.' " *MTA v. King, supra,* 369 Md. at 290–291, 799 A.2d at 1255–1256 (emphasis in original). The Court of Special Appeals in the present case distinguished *King* in the following language:

"The case at bar is distinguishable from *King.* This is not a case in which an individual claims that his or her punishment was disproportional to that of others who committed the same act. We are not comparing appellee's punishment to punishment imposed upon others."

The Maryland Aviation Administration filed in this Court a petition for a writ of certiorari which we granted. *MAA v. Noland,* 374 Md. 358, 822 A.2d 1224 (2003). Noland did not file a cross-petition for a writ of certiorari.

## II.

We shall first review some of the basic Maryland administrative law principles applicable to cases of this nature, as well as the Court of Special Appeals' opinion in *Maryland State Retirement Agency v. Delambo, supra.* Thereafter, we shall address the decisions below in light of these principles.

## A.

About six years ago, in *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 67–69, 729 A.2d 376, 380–381

(1999), this Court extensively reviewed the role of a court in reviewing an adjudicatory decision of an administrative agency, stating (some internal quotation marks omitted):

"A court's role in reviewing an administrative agency adjudicatory decision is narrow, *United Parcel v. People's Counsel*, 336 Md. 569, 576, 650 A.2d 226, 230 (1994); it 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' *United Parcel*, 336 Md. at 577, 650 A.2d at 230. *See also* Code (1984, 1995 Repl.Vol.), § 10–222(h) of the State Government Article; *District Council v. Brandywine Enterprises, Inc.*, 350 Md. 339, 349, 711 A.2d 1346, 1350–1351 (1998); *Catonsville Nursing v. Loveman*, 349 Md. 560, 568–569, 709 A.2d 749, 753 (1998)."

"In applying the substantial evidence test, a reviewing court decides 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.' *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978). *See Anderson v. Dep't of Public Safety*, 330 Md. 187, 213, 623 A.2d 198, 210 (1993). A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. *CBS v. Comptroller*, 319 Md. 687, 698, 575 A.2d 324, 329 (1990). A reviewing court ' "must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence.' *CBS v. Comptroller, supra*, 319 Md. at 698, 575 A.2d at 329, quoting *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 834–835, 490 A.2d 1296, 1301 (1985). *See Catonsville Nursing v. Loveman, supra*, 349 Md. at 569, 709 A.2d at 753 (final agency decisions 'are *prima facie* correct and carry with them the presumption of validity')."

"Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is *not* to

'substitute its judgment for the expertise of those persons who constitute the administrative agency,' *United Parcel v. People's Counsel, supra,* 336 Md. at 576–577, 650 A.2d at 230, quoting *Bulluck v. Pelham Wood Apts., supra,* 283 Md. at 513, 390 A.2d at 1124. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. *Lussier v. Md. Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ('The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight').[2] Furthermore, the expertise of the agency in its own field should be respected. *Fogle v. H & G Restaurant,* 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make 'significant discretionary policy determinations'); *Bd. of Ed. For Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ('application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the' legal issues)."

---

"[2] On the other hand, when a statutory provision is entirely clear, with no ambiguity whatsoever, 'administrative constructions, no matter how well entrenched, are not given weight.' *Macke Co. v. Comptroller,* 302 Md. 18, 22–23, 485 A.2d 254, 257 (1984)."

The principles summarized in *Banks* have been reaffirmed by this Court in numerous opinions since *Banks*. *See, e.g., Christopher v. Montgomery County Dept. of Health & Human Services,* 381 Md. 188, 197–199, 849 A.2d 46, 51–52 (2004); *Board of Physician Quality Assurance v. Mullan,* 381 Md. 157, 164–172, 848 A.2d 642, 646–651 (2004); *Finucan v. Board of Physician Quality Assurance,* 380 Md. 577, 590–597, 846 A.2d 377, 384–389 (2004); *Sadler v. Dimensions,* 378 Md. 509,

528–530, 836 A.2d 655, 666–667 (2003); *Smack v. Dept. of Health,* 378 Md. 298, 313 n. 7, 835 A.2d 1175, 1183–1184 n. 7 (2003); *Montgomery v. E.C.I.,* 377 Md. 615, 625–626, 835 A.2d 169, 175–176 (2003); *Watkins v. Secretary, Dept. of Safety & Correctional Services,* 377 Md. 34, 45–46, 831 A.2d 1079, 1086 (2003); *Fosler v. Panoramic Design, Ltd.,* 376 Md. 118, 136–137, 829 A.2d 271, 282 (2003); *Kram v. Maryland Military,* 374 Md. 651, 656–657, 824 A.2d 99, 102–103 (2003); *MVA v. Lytle,* 374 Md. 37, 56–57, 821 A.2d 62, 73 (2003); *Mehrling v. Nationwide,* 371 Md. 40, 57, 806 A.2d 662, 672 (2002); *Annapolis Market v. Parker,* 369 Md. 689, 703–704, 802 A.2d 1029, 1038 (2002); *Jordan v. Hebbville,* 369 Md. 439, 449–452, 800 A.2d 768, 774–776 (2002); *Division of Labor v. Triangle General Contractors, Inc.,* 366 Md. 407, 416–417, 784 A.2d 534, 539–540 (2001); *Marzullo v. Kahl,* 366 Md. 158, 171–173, 783 A.2d 169, 177–178 (2001); *Gigeous v. ECI,* 363 Md. 481, 495–497, 769 A.2d 912, 921–922 (2001).[3]

---

**3.** As pointed out in *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 68–69, 729 A.2d 376, 381 (1999), a few of this Court's opinions, in attempting to set forth a standard for judicial review of agency decisions on issues of law, have said that the court may "substitute the court's judgment for that of the agency's." The *Banks* opinion, as well as several of the more recent opinions cited above, have called this language "unfortunate" and have disapproved its use to describe judicial review of legal issues. Nonetheless, a few appellate opinions, including some by this Court and the Court of Special Appeals' opinion in the case at bar, have continued to employ this "substituted judgment" standard.

The "substituted judgment" language is misleading and inaccurate for several reasons. It suggests, with respect to legal issues, that no deference whatsoever is owed to the agency's decision. That is not the law. In an action for judicial review of an administrative agency's decision, the "court must review the agency's decision in the light most favorable to it," and "the agency's decision is prima facie correct and presumed valid," *Banks,* 354 Md. at 68, 729 A.2d at 381 (internal quotation marks omitted). In addition, the agency's interpretations and applications of statutory or regulatory provisions "which the agency administers should ordinarily be given considerable weight by reviewing courts." *Banks,* 354 Md. at 69, 729 A.2d at 381. "Furthermore, the expertise of the agency in its own field should be respected." *Banks, ibid.*

In the context of a determination by an agency or official in the Executive Branch of the State Government, the term "judgment" is often used to mean the exercise of discretion, such as an official

Turning specifically to administrative decisions imposing discipline or sanctions upon individuals, in *MTA v. King, supra,* 369 Md. at 290, 799 A.2d at 1255, the Court of Special Appeals mandated a reversal of an administrative decision terminating the employment of a state government employee. The intermediate appellate court based its decision on the grounds, *inter alia,* "that termination of King's employment 'was disproportionate to the offense' and that King's misconduct was not 'so serious as to warrant dismissal.' " This Court reversed the judgment of the Court of Special Appeals, pointing out that, under the Maryland Administrative Procedure Act, Code (1984, 2004 Repl.Vol.), §§ 10–201 *et seq.* of the State Government Article, "[t]he grounds set forth in § 10–222(h) for reversing or modifying an adjudicatory administrative decision do not include disproportionality or abuse of discre-

---

exercising "good judgment." *See Webster's Third New International Dictionary,* Unabridged, at 1223 (1981). Obviously a court may not substitute its exercise of discretion for that exercised by the Executive Branch agency or official.

More importantly, however, when an agency or official in the Executive Branch of Government exercises "judgment," the agency or official is ordinarily performing a task which the Maryland Constitution or statutes have assigned to the Executive Branch and not to the Judicial Branch. The phrase that a court "substitutes its judgment" for the judgment of the Executive Branch suggests that the court is engaging in precisely the same type of determination, and is performing a function, which has been assigned to the Executive. Nevertheless, for the court to perform the same function as the Executive Branch would not be consonant with the express separation of powers mandate set forth in Article 8 of the Maryland Declaration of Rights. *See Sadler v. Dimensions,* 378 Md. 509, 530, 836 A.2d 655, 667–668 (2003), where Judge Raker for the Court recently emphasized that "judicial review of the actions of an administrative agency is restricted primarily because of the fundamental doctrine of separation of powers as set forth in Article 8 of the Declaration of Rights of the Maryland Constitution." *See also, e.g., Bell Atlantic v. Intercom,* 366 Md. 1, 21–22, 782 A.2d 791, 803 (2001); *Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 220–221, 334 A.2d 514, 521–522 (1975).

If there is a need to articulate a "standard" for judicial review of an agency's legal rulings, it is sufficient to say that a reviewing court must "determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994), and cases there cited.

tion." *MTA v. King, supra*, 369 Md. at 291, 799 A.2d at 1255. We continued in *King* to set forth the appropriate standard for reviewing the administrative discipline or sanction imposed in cases of this nature (369 Md. at 291, 799 A.2d at 1255–1256):

"As long as an administrative sanction or decision does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'"

More recently, in *Spencer v. State Board of Pharmacy*, 380 Md. 515, 529–531, 846 A.2d 341, 349–350 (2004), Judge Raker for the Court explained that judicial review of a lawful and authorized administrative disciplinary decision or sanction, ordinarily within the discretion of the administrative agency, is more limited than judicial review of either factual findings or legal conclusions (footnote omitted):

"Logically, the courts owe a higher level of deference to functions specifically committed to the agency's discretion than they do to an agency's legal conclusions or factual findings. Therefore, the discretionary functions of the agency must be reviewed under a standard more deferential than either the ... review afforded an agency's legal conclusions or the substantial evidence review afforded an agency's factual findings. In this regard, the standard set forth in § 10–222(h)(3)(vi), review of 'arbitrary or capricious' agency actions, provides guidance for the courts as they seek to apply the correct standard of review to discretionary functions of the agency."

*      *      *

"[I]n *MTA v. King*, we held that an agency's discretion to determine the magnitude of a sanction could only be reviewed pursuant to § 10–222(h)(3)(vi), *i.e.*, for arbitrariness or capriciousness. 369 Md. at 291, 799 A.2d at 1255–56.

Even if the court felt the punishment to be 'disproportionate' to the violation, the agency's determination of the amount or level of sanction could not be second-guessed, unless the sanction 'was so extreme and egregious that the reviewing court can properly deem the decision to be "arbitrary or capricious," ' as set forth in § 10–222(h)(3)(vi). *Id.*"

See also *Board of Physician Quality Assurance v. Mullan, supra,* 381 Md. at 171, 848 A.2d at 650 ("The arbitrary or capricious standard, as we have stated before, sets a high bar for judicial intervention, meaning the agency action must be 'extreme and egregious' to warrant judicial reversal under that standard"); *Dept. of Public Safety and Correctional Services v. Howard,* 339 Md. 357, 367, 663 A.2d 74, 78 (1995) (State employee termination decision reviewed under the "arbitrary and capricious" standard); *Maryland State Police v. Zeigler,* 330 Md. 540, 557–558, 625 A.2d 914, 922 (1993) ("[A]s long as an administrative agency's exercise of discretion does not violate regulations, statutes, common law principles, due process and other constitutional requirements, it is ordinarily unreviewable by the courts. * * * It is only when an agency's exercise of discretion, in an adjudicatory proceeding, is 'arbitrary' or 'capricious' that courts are authorized to intervene"); *Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 225, 334 A.2d 514, 524 (1975) ("[T]he judiciary is constitutionally 'without authority to interfere . . . with the lawful exercise of administrative . . . discretion,' " quoting *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945)); *Solomon v. State Board of Physician Quality Assurance,* 155 Md.App. 687, 707–708, 845 A.2d 47, 59–60 (2003).

The Court of Special Appeals, in the case at bar, indicated that the principles set forth in *MTA v. King* and its progeny applied only to "a case in which an individual claims that his or her punishment was disproportional to that of others who committed the same act." The appellate court declined to apply the standard set forth in *King* on the ground that "[w]e are not comparing appellee's punishment to the punishment imposed on others."

The Court of Special Appeals' narrow interpretation of *King* and other Court of Appeals' cases is erroneous. No language in *King* or any other Court of Appeals' opinion suggests such a limitation. On the contrary, the *King* opinion stated that judicial review does not include review to determine whether a sanction was " 'disproportionate to the *offense* ' " or "disproportionate to [the employee's] *misconduct*," *King, supra,* 369 Md. at 290–291, 799 A.2d at 1255–1256 (emphasis added). No issue was raised in *King,* or mentioned in the *King* opinion, about any sanction that might have been imposed on someone else. *See also, e.g., Spencer v. Board of Pharmacy, supra,* 380 Md. at 531, 846 A.2d at 350 ("Even if the court felt the punishment to be 'disproportionate' to the *violation,* the agency's determination of the amount or level of sanction [can] not be second-guessed, unless the sanction was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious' ") (emphasis added and some internal quotation marks omitted).

■ Consequently, the limitation upon the judicial review authority of courts, with regard to a lawful and authorized sanction, imposed by an Executive Branch administrative agency, applies broadly. It encompasses arguments that the discipline or sanction imposed was "disproportionate to the offense," or "disproportionate to the misconduct," or "disproportionate to the violation."

### B.

■ The Court of Special Appeals also erred in *Maryland State Retirement Agency v. Delambo, supra,* 109 Md.App. 683, 675 A.2d 1018 (1996), and in the present case, by imposing upon Executive Branch administrative agencies numerous non-statutory requirements in employee disciplinary cases. *Delambo,* like the instant case, involved a final administrative decision removing a state government employee for misconduct. Upon judicial review of the agency's decision, the Circuit Court for Baltimore City held that the administrative findings of fact, that the employee engaged in specified misconduct, were "supported by competent, material, and sub-

stantial evidence," and that the administrative "decision is not affected by any error of law." *Delambo,* 109 Md.App. at 687–688, 675 A.2d at 1020. Nevertheless, the Circuit Court reduced the sanction to a seventeen-month suspension without pay on the ground that "substantial evidence" did not support the administrative determination that the employee's " 'actions made her unfit for the performance of her duties.' " 109 Md.App. at 688, 675 A.2d at 1020.

On appeal to the Court of Special Appeals, the appellate court also upheld the administrative finding of fact that Ms. Delambo had engaged in misconduct. On the other hand, the Court of Special Appeals held that the Circuit Court was not authorized to substitute a different sanction in place of the sanction imposed by the agency. The Court of Special Appeals vacated the decisions below, ordered that the case be remanded to the agency for the imposition of a new sanction, and that the agency prepare findings of fact justifying the particular sanction imposed. The intermediate appellate court in *Delambo* explained (109 Md.App. at 691–692, 675 A.2d at 1022):

"In this case, appellant failed adequately to articulate why removal of appellee was an appropriate exercise of discretion. Instead, appellant merely adopted the ALJ's finding that appellee's 'exceedingly poor judgment, resulting in her misconduct reflects that she is unfit to hold a position in this agency.' There is no indication that either the ALJ or the Secretary (1) considered any of the other relevant factors that must be considered in determining the severity of appellee's punishment, or (2) considered imposing any of the alternative sanctions that might have been appropriate under the circumstances." *Cf., Colter, supra,* 297 Md. at 430–431, 466 A.2d 1286.

"For all that appears in the record before us, appellee was fired because she could be fired. We cannot determine what—if any—consideration was given to appellee's (1) overall employment history in State service, (2) attendance record during that period of time, (3) disciplinary record at the present agency and at other State agencies as well, (4)

work habits, and (5) relations with fellow employees and supervisors. All these factors should have been considered by the ALJ and the Secretary. Appropriate consideration should also have been given to making 'the punishment fit the crime.' "

\*　　\*　　\*

"The agency must prepare findings of fact and conclusions of law that are adequate for judicial review. *Redden v. Montgomery County*, 270 Md. 668, 685, 313 A.2d 481 (1974). Consistent with the example contained in *Redden*, we recommend that the agency's 'bottom line' sanction be accompanied by a statement that explains ... why the agency has decided against imposing any of the other sanctions that it has discretion to impose, i.e., why, under the circumstances, the punishment 'fits' the misconduct."

The requirements imposed upon administrative agencies in the *Delambo* opinion, *i.e.*, that the agencies in employee disciplinary cases make findings of fact showing that consideration was given to various enumerated factors, showing that alternate sanctions were considered, and explaining why "the punishment 'fits' the misconduct," find no support in the Maryland Administrative Procedure Act or in Maryland administrative law generally. It is true that administrative agencies in adjudicatory cases are required to make findings of fact with respect to *factual* matters. *See, e.g.,* Code (1984, 2004 Repl.Vol.), § 10–221(b)(1)(i), (b)(3), and (b)(4) of the State Government Article; *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 552–553, 723 A.2d 440, 450–451 (1999) (In a non-statutory judicial review action, as in a statutory judicial review action, findings of fact concerning factual issues are required in order for a reviewing court to determine if the agency's findings are supported by substantial evidence and to comply with the "fundamental right of a party to a proceeding before an administrative agency ... to be apprised of the facts relied on by the agency"); *District Council v. Brandywine*, 350 Md. 339, 347, 711 A.2d 1346, 1350 (1998) ("[W]hen a decision is rendered in a contested [matter] ..., written findings of fact and conclusions must be provid-

ed"); *Forman v. Motor Vehicle Administration,* 332 Md. 201, 221, 630 A.2d 753, 764 (1993) ("Without findings of fact on all *material issues,* ... a reviewing court cannot properly perform its function") (emphasis added); *Mossburg v. Montgomery County,* 329 Md. 494, 507, 620 A.2d 886, 893 (1993) ("[W]e have held that the decision of" an administrative agency "must be reversed where the [agency] failed to make findings of fact resolving a *particular conflict* ") (emphasis added); *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772, 778 (1991) (The requirement of findings of fact "is in recognition of the fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings"), and cases there cited.

■ Thus, in an administrative governmental employment disciplinary case based on alleged misconduct, the agency is required to make findings of fact concerning the alleged misconduct. Moreover, to the extent that the nature of the sanction imposed depends upon the resolution of disputed facts or conflicting inferences, the agency must make findings of fact resolving such disputes or conflicts. Nevertheless, no statutory provision or Court of Appeals administrative law opinion has been called to our attention which requires that the imposition of a lawful and authorized sanction, within the discretion of the administrative agency, be justified by findings of fact. This Court's holdings make it clear that there is no such requirement. As earlier pointed out, the Court in *Spencer v. Board of Pharmacy, supra,* 380 Md. at 529, 846 A.2d at 349, reaffirmed the principle that "the courts owe a higher level of deference to functions specifically committed to the agency's discretion than they do to an agency's legal conclusions or factual findings. Therefore, the discretionary functions of the agency must be reviewed under a standard more deferential than ... the substantial evidence review afforded any agency's factual findings." [4]

---

4. The Court of Special Appeals in its *Delambo* opinion relied upon two Court of Appeals' opinions as support for its holding that an administra-

In sum, when the discretionary sanction imposed upon an employee by an adjudicatory administrative agency is lawful and authorized, the agency need not justify its exercise of discretion by findings of fact or reasons articulating why the agency decided upon the particular discipline. A reviewing court is not authorized to overturn a lawful and authorized sanction unless the "disproportionality [of the sanction] or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'" *MTA v. King, supra,* 369 Md. at 291, 799 A.2d at 1255–1256. Furthermore, the employing agency does not have the burden, in the reviewing court, of justifying such a sanction. Instead, in accordance with the principle that the agency's decision is prima facie correct and presumed valid, *Board of Physician Quality Assurance v. Banks, supra,* 354 Md. at 68, 729 A.2d at 381, the burden in a judicial review action is upon the party challenging the sanction to persuade the reviewing court that the agency abused his discretion and that the decision was "so extreme and egregious" that it constituted "arbitrary or capricious" agency action. *Maryland State Retirement Agency v. Delambo, supra,* 109 Md. App. 683, 675 A.2d 1018, is inconsistent with these principles and is overruled in its entirety.

tive agency must render findings of fact justifying a lawful, authorized sanction which is within the agency's discretion to impose. They were *Redden v. Montgomery County,* 270 Md. 668, 685, 313 A.2d 481, 490 (1974), and *Colter v. State,* 297 Md. 423, 466 A.2d 1286 (1983). Neither opinion supports the Court of Special Appeals holding in *Delambo. Redden* was a zoning case, and the administrative agency had failed to set forth findings of fact concerning the grounds relied upon by those opposing the application for a special exception. *Colter* was a criminal case where the trial judge, in imposing a sanction for violation of a discovery rule, had misapplied the rule.

With reference to criminal cases, it is noteworthy that the Court of Special Appeals' *Delambo* opinion required much more of an Executive Branch adjudicator imposing a discretionary sanction than Maryland law requires of trial courts imposing a criminal sanction where there is no separation of powers consideration. *Cf. State v. Dopkowski,* 325 Md. 671, 678–680, 602 A.2d 1185, 1188–1189 (1992); *Reid v. State,* 302 Md. 811, 819–820, 490 A.2d 1289, 1293–1294 (1985), and cases there cited,

## C.

In the case at bar, the application of the principles outlined above clearly requires a reversal of the Court of Special Appeals' and the Circuit Court's judgments, coupled with a direction to affirm the administrative decision.

The Court of Special Appeals' judgment in this case was essentially based upon that court's earlier decision in *Maryland State Retirement Agency v. Delambo, supra,* and upon that court's misinterpretation of *MTA v. King, supra.* The overruling of *Delambo,* and our re-affirmation of *King* and its progeny, mandate a reversal of the Court of Special Appeals' decision.

Moreover, Noland in the Circuit Court did not meet his burden of demonstrating that the administrative decision "was so extreme and egregious" that it amounted to "arbitrary or capricious" action. The testimony of Dr. Phillips, who was BWI's Medical Director, as well as the testimony of the Chief of the BWI Fire Department, was that "it is never warranted to strike a patient." This testimony, coupled with other evidence, would preclude a reviewing court from holding that the administrative decision was arbitrary or capricious.

While the Circuit Court, or the Court of Special Appeals, or this Court might have imposed a lesser sanction if the decision were for them to make, none of these entities constituted the authorized decision-makers. The sanction imposed was lawful, authorized, and within the discretion of the Executive Branch agency having the authority to render the decision. It was not shown to be arbitrary or capricious. Therefore the Circuit Court should have affirmed the administrative decision.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO RE-VERSE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE ADMINISTRATIVE DECISION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL*

*APPEALS TO BE PAID BY THE RESPONDENT NO-LAND.*