886 A.2d 554

# DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES

v.

## Kathleen PALMER et al.

## No. 74, Sept. Term, 2004.

Court of Appeals of Maryland.

Nov. 8, 2005.

Reconsideration Denied Dec. 16, 2005.

Michelle J. McDonald, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Lisa M. O'Mara (Davis & Associates Law Offices, P.A., on brief), Towson, for appellees.

Argued before BELL, C.J. RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, RODOWSKY, LAWRENCE F. (retired, specially assigned), JJ.

RODOWSKY, J.

This is an action, brought by the appellant, Department of Public Safety and Correctional Services (the Department or Management), for judicial review of the final administrative decision of employee grievances that were consolidated for hearing and decision. Appellees (the Grievants) are employed at the Eastern Correctional Institution (ECI) in non-uniformed positions in the Case Management and Commitment Records Units.[1] The Grievants claimed, *inter alia*, that the ECI security search policy, effective September 17, 2001, required them to use personal leave time to undergo searches and related delays while entering and exiting the Institution. Unsuccessful before the Warden and the designee of the Secretary of the Department, the Grievants appealed to the Secretary of Budget and Management (the Secretary) pursuant to Maryland Code (1993, 2004 Repl.Vol.), § 12–205 of the State Personnel and Pensions Article (SPP).

When the grievances were not settled at that third stage of the grievance procedure, the Secretary referred the grievances to the Office of Administrative Hearings, as required by SPP § 12–205(b)(2)(ii). The Administrative Law Judge (ALJ) ruled in favor of the Grievants on the issue that is before us. The ALJ's decision was upheld by the Circuit Court for Somerset County on judicial review.[2] The Department ap-

---

1. The Grievants are Kathleen Palmer, Teresa Cheesman, Stephanie Boucher, Linda Ramsey, Julia Webster, Carolyn Jones, Laurie Harris, Bonnie Muir, and Lori Ball.

2. On certain aspects of the grievances, the ALJ ruled in favor of the Department, and both the Department and the Grievants petitioned for

pealed to the Court of Special Appeals, and this Court issued the writ of certiorari on its own motion prior to consideration of the appeal by the intermediate appellate court.

The Department raises a single issue, *i.e.:*

"Did the ALJ err, as a matter of law, by misinterpreting and misapplying a state overtime regulation to require that correctional employees be compensated for the time spent waiting to be searched, pursuant to an institutional policy that required searches for all persons entering a secure portion of the correctional institution, where there was no evidence that the searches were related to the employees' job functions or principal activities."

The facts as found by the ALJ are as follows:

"1.  At all times relevant to this proceeding, the Grievants were employed at ECI, as non-uniformed personnel, working in the Case Management Unit.

"2.  In September, 2001, the Warden instituted a Security Policy that required all personnel at ECI to be searched prior to entering the facility.

"3.  Sometime before that, Management had moved the time clock used by the Grievants to clock in and out.

"4.  Originally, the Grievants used the time clock in the administrative building, adjacent to the parking lot.

"5.  Any individual can enter the administrative building from the parking lot without going through any security.

"6.  The time clock, however, was moved to a location in the case management area, at the far end of the [E]ast [C]ompound.

"7.  This meant that case management staff could not punch in [on] arrival at work, until going through several secure ports, beginning at the East Compound gate.

---

judicial review.  The Grievants, however, did not pursue their petition in the circuit court.

"8.  In September, 2001, the Warden required all staff to be searched before entering or leaving the institution.

"9.  In addition, shortly thereafter, the East Compound Gate, the closest entry way to the Case Management area[,] was closed.

"10.  As a result of the closing of the East Compound Gate, employees going to the Case Management area had several more security checks to pass through, including the main entry to the institution.

"11.  As a result of the searches done since September, 2001, it takes the Grievants 10 to 15 minutes longer to get to the Case Management area where their time clock is, at the very least.[3]

"12.  On some days, the delay is longer, as when no officer is at a post necessary for the Grievants to pass through security or when an inmate is arriving.

"13.  If an employee is delayed by the search requirements and security, in getting to an office location, the Grievant must use his/her leave time.

"14.  Grievant Lori Ball had to use leave because a surprise 'hostage scenario' drill delayed her ability to get to her work area.[4]

"15.  Grievant Lori Ball was directed out of the security line, and sent to make food by Management during the hostage scenario.

"16.  On another occasion, Grievant Stephanie Boucher was late arriving to her work station because the 'officer in the bubble' at one of the secure gates was in the restroom.

---

**3.**  The Department contests this finding.  There was, however, evidence from the witnesses Boucher, Ramsey, and Palmer that the delay could be as much as fifteen minutes.

**4.**  The Department contests this finding.  There was evidence that Ms. Ball was paid for an eight hour day on the occasion of the surprise hostage scenario drill.

"17. As a result of being late, Grievant Stephanie Boucher had to use her personal leave time.

"18. An employee late to a work station because of going through search and security is subject to disciplinary action.[5]

"19. Although the Grievants have the right to a one half-hour duty free lunch, they are unable to leave the institution to take lunch without using leave time because the amount of time it takes to pass through security precludes them from finishing lunch within thirty minutes.

"20. In order to avoid discipline, the Grievants fill out leave slips before leaving the facility for lunch, as they can never be sure whether they will be able to clock in as a result of the delays in passing through security.

"21. Grievant Linda Ramsey had to leave and to return to work frequently to attend medical appointments while she was pregnant.

"22. An extra 15 minutes was added for each entry and exit to the amount of sick leave Grievant Ramsey had to take because she had to undergo search and security procedures.

"23. Female correctional officers pat down females entering the facility.

"24. Grievant Palmer has been delayed getting to work because no female correctional officer was available to do her pat down.

"25. The Grievants have filed a grievance, seeking to use the administrative clock."

The Grievants made plain that they do not contest the requirement that they clear security. They seek to punch in before, and out after, they have cleared security, so that they will not be charged personal leave time if they do not arrive at

---

**5.** The Department contests this finding because Warden Kupac testified that no such action has been taken.

their work stations by the start of a shift or if they leave their work stations before the end of a shift. In other words, the issue raised is whether the time spent in clearing security is part of the Grievants' work time.

The ALJ rested the agency's decision on a construction of a regulation of the Secretary, Md. Regs. Code (COMAR), Title 17, "Department of Budget and Management," Subtitle 04, "Personnel Services and Benefits," Chapter 11, "Leave," § 02, "Workweek, Overtime and Compensatory Time," and particularly on § 17.04.11.02B(1)(g). The latter, in context, reads:

"B. Work Time.

"(1) Work time includes time during which an employee:

"(a) Is on duty, whether at the employee's principal job site or at a remote location as part of the State's telecommuting program;

"(b) Is on paid leave;

"(c) Participates in training activities as a job assignment;

"(d) Is on the employer's premises and is on call and waiting for work;

"(e) Is not on the employer's premises, but is on call and waiting for work, and the employee's personal activities are substantially restricted;

"(f) Is changing into and removing program-specified clothing and equipment necessary for the performance of the job;

"(g) Participates in activities that are *job-related* immediately before the beginning or immediately after the end of an assigned shift;

"(h) Travels to and from work after being recalled to work by the appointing authority or the appointing authority's designated representative after the employee has completed the standard workday;

"(i) Travels to and from work after being called to work by the appointing authority or the appointing authority's designated representative on the employee's scheduled day

off if the employee works fewer than 8 hours as a result of being called on the employee's scheduled day off;

"(j) Travels between home and a work site other than the assigned office, in accordance with the Standard Travel Regulations under COMAR 23.02.01;

"(k) With prior supervisory approval, investigates and processes a disciplinary appeal or grievance, and participates at any conference or hearing relating to a grievance or appeal, in accordance with COMAR 17.04.07.07; or

"(*l*) With prior supervisory approval, uses reasonable time to investigate and process a complaint under State Personnel and Pensions Article, Title 5, Annotated Code of Maryland.

"(2) Work time includes any other time defined as work time under the Fair Labor Standards Act (FLSA), if applicable."

(Emphasis added).

The ALJ concluded that waiting to undergo and undergoing security checks at ECI constituted "job-related" activities of the Grievants, as set forth, but only to the extent set forth, in COMAR 17.04.11.02B(1)(g), reasoning as follows:

"First, the requirement to undergo security on site is a prerequisite to the [e]mployee's commencement of and completion of the work day. Second, it cannot be accomplished off-site, on the employee's own time. Third, this pre-requisite is mandated by Management. Fourth, as evidenced by Grievant Ball's experience, while in line, employees are subject to Management's assignment and supervision. Fifth, the time it takes for an employee to undergo security can be unduly delayed by Management activities such as a lock-down, or entry of inmates into the institution or unavailability of a female officer."

The ALJ, however, carefully limited the Grievants' work time to the scope of COMAR 17.04.11.02B(1)(g), holding that time spent clearing security checks was "job-related" only when entering or exiting a shift.[6]

---

6. Grievances relating to clearing security for off premises lunch or for permitted absences for part of the workday could not rest on

The ALJ also stated that "the only reason to consider the activity not to be 'job-related' is that all individuals [entering and leaving the Institution], whether employees or not, undergo the same security check." However, the ALJ rejected that argument by concluding that, "for the Grievants, the activity is 'job-related' even if it is not for every one else."

Addressing implementation of the ruling, the ALJ said:

"[T]he real issue raised by the Grievants is whether their activities in waiting to, and undergoing security, constitute work time. Having concluded that it does constitute 'work time,' Management can no longer require the Grievants to use their leave for this activity. However, the manner and method that Management chooses to comply with this requirement is up to Management. One way would be to allow use of the clock in the administrative building, but Management is free to utilize any other method, as well."

The Department had argued before the ALJ, as it argues in this Court, that COMAR § 17.04.11.02B(1)(g) (hereinafter ¶ (g)) "was intended to do nothing more than compensate an employee for those preliminary and postliminary activities that are compensable under the [Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*] as 'integral parts of a principal activity.'" Brief of Appellant at 11. The derivation of the argument is the Portal to Portal Pay Act, 29 U.S.C. §§ 251 through 262. Title 29, U.S.C. § 254 provides in part that an employer has no liability under certain federal statutes, including the FLSA, on account of failure to pay minimum wages or overtime compensation for

"(1) walking, riding or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

"(2) activities which are preliminary to or postliminary to said principal activity or activities[.]"

---

§ 17.04.11.02B(1)(g), and, as to those aspects of the employment relationship, the Grievants based their claims on federal law. The ALJ rejected those federal law arguments of the Grievants.

29 C.F.R. § 785.24(b) explains that "[t]he term 'principal activities' includes all activities which are an integral part of a principal activity."

The United States Supreme Court in *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 335, 100 L.Ed. 267, 273 (1956), has interpreted the Portal to Portal Pay Act to mean that "activities performed either before or after the regular work shift, on or off the production line, are compensable . . . if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed." The Department's position is that the scope of "job-related" in ¶ (g) is limited to the scope of the federal law.

The ALJ concluded that ¶ (g) was not so limited. Under the Maryland Regulation, said the ALJ, "the activity can be only tangentially related, or entirely unrelated, to the principal duties of the Grievants. In short, the required pre- or post-shift activity need only be 'related' in some way to the job of Case Management staff." The task before us, therefore, is to determine whether the ALJ misconstrued ¶ (g).

Cases in this Court, and in the Court of Special Appeals, have stated that, in reviewing administrative agency decisions based on conclusions of law, a court may substitute its judgment for the agency's if its interpretation of the applicable legal principle is different. *Caucus Distrib., Inc. v. Maryland Sec. Comm'r,* 320 Md. 313, 577 A.2d 783 (1990); *Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 490 A.2d 1296 (1985); *Perini Serv., Inc. v. Maryland Health Res. Planning Comm'n,* 67 Md.App. 189, 201, 506 A.2d 1207, 1213, *cert denied,* 307 Md. 261, 513 A.2d 314 (1986); *Doctors' Hosp. of Prince George's County v. Maryland Health Res. Comm'n,* 65 Md.App. 656, 667–68, 501 A.2d 1324, 1329–30 (1986).

Recently, Judge Eldridge, writing for this Court in *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 873 A.2d 1145 (2005), reemphasized what this Court had said in *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 729 A.2d

376 (1999), concerning judicial review of administrative agency decisions on questions of law.

> " 'Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is *not* to "substitute its judgment for the expertise of those persons who constitute the administrative agency," *United Parcel v. People's Counsel,* 336 Md. [569,] 576–577, 650 A.2d [226,] 230 [ (1994) ], quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. [505,] 513, 390 A.2d [1119,] 1124 [ (1978) ]. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. *Lussier v. [Maryland] Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ("The interpretation of a statute by those officials charged with administering the statute is . . . entitled to weight"). Furthermore, the expertise of the agency in its own field should be respected. *Fogle v. H & G Restaurant,* 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make "significant discretionary policy determinations"); *[Board] of Ed. For Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ("application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the" legal issues).

*Noland,* 386 Md. at 571–72, 873 A.2d at 1154–55 (footnote omitted).

Further, with respect to the use of "substituted judgment" language to describe the standard of review, we stated:

> "The 'substituted judgment' language is misleading and inaccurate for several reasons. It suggests, with respect to legal issues, that no deference whatsoever is owed to the agency's decision. That is not the law. In an action for

judicial review of an administrative agency's decision, the 'court must review the agency's decision in the light most favorable to it,' and 'the agency's decision is prima facie correct and presumed valid,' *Banks*, 354 Md. at 68, 729 A.2d at 381 (internal quotation marks omitted). In addition, the agency's interpretations and applications of statutory or regulatory provisions 'which the agency administers should ordinarily be given considerable weight by reviewing courts.' *Banks*, 354 Md. at 69, 729 A.2d at 381."

*Id.* at 573 n. 3, 873 A.2d at 1155 n. 3.

Recognizing the interplay of the doctrine of separation of powers with judicial review of the decisions of administrative agencies, we stated:

"More importantly ... when an agency or official in the Executive Branch of Government exercises 'judgment,' the agency or official is ordinarily performing a task which the Maryland Constitution or statutes have assigned to the Executive Branch and not the Judicial Branch. The phrase that a court 'substitutes its judgment' for the judgment of the Executive Branch suggests that the court is engaging in precisely the same type of determination, and is performing a function, which has been assigned to the Executive."

*Id.* at 574 n. 3, 873 A.2d at 1155 n. 3.

We concluded in *Noland* that if the standard for judicial review must be articulated, "it is sufficient to say that a reviewing court must 'determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Id.* (quoting *United Parcel Serv.*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994)).

In the case before us we hold that the administrative decision was not premised upon an erroneous conclusion of law. First, under the principles reviewed above, the agency's interpretation of the statute administered by it is entitled to a degree of deference described as " 'considerable weight.' " *Noland*, 386 Md. at 572, 873 A.2d at 1154. This rule is not altered in the instant matter by the fact that the agency's determination was made by an ALJ. Under the grievance procedure set forth in SPP §§ 12–201 through 12–205, "[t]he

decision of the Office of Administrative Hearings is the final administrative decision." SPP § 12–205(c)(2)(ii).

Second, the decision of the ALJ is supported by ordinary rules of statutory construction. By the plain language of ¶ (g), the activity need only be job-related, and the ALJ gave explanations that are reasonable and hardly arbitrary for concluding that the security clearance activity in the instant matter was job-related. Further, the construction urged by the Department, under which a job-related activity must be an integral part of a principal activity of the employment, requires inserting words into ¶ (g) that are not there.

In addition, the Department's argument, that job-related work time under ¶ (g) is no broader than under federal law, renders ¶ (g) superfluous. COMAR § 17.04.11.02B(2) provides that "[w]ork time includes any other time defined as work time under the Fair Labor Standards Act (FLSA), if applicable." Thus, if ¶ (g) were merely coextensive with federal law on activities that are preliminary to, or postliminary to, principal activities of the employment, ¶ (g) would not be needed at all.

We also note that the construction of ¶ (g) by the ALJ is consistent with the legislative policy concerning overtime compensation for "all employees over whom the Secretary has authority to administer pay." SPP § 8–301(a). SPP § 8–302 provides:

"(a) *Construction of Subtitle.*—This subtitle [Overtime Compensation] shall be interpreted and applied, to the extent applicable, in accordance with the Federal Fair Labor Standards Act;

"(b) *Entitlement.*—All employees subject to this subtitle are *entitled to the greater of:*

"(1) The benefits that are provided in this subtitle; or

"(2) To the extent applicable, the benefits required by the [F]ederal Fair Labor Standards Act."
(Emphasis added).

Thus, COMAR 17.04.11.02B(2) is intended to be a floor and not a ceiling. After enumerating in ¶¶ (a) through (*l*) the

types of activities that constitute work time for Maryland purposes, the regulator added, "Work time includes any other time defined as work time under the Fair Labor Standards Act (FLSA), if applicable." This covers the contingency that the enumeration in ¶¶ (a) through (*l*) had failed to include that which might be required federally. It is "another way of stating that federal law is the supreme law of the State, anything in the laws of this State to the contrary notwithstanding." *Maryland Military Dept. v. Cherry*, 382 Md. 117, 124, 854 A.2d 1200, 1205 (2004). We discern no legislative intent to limit ¶ (g) to the scope of federal law.

The Department argues that there was a lack of substantial evidence to support the ALJ's conclusion, because there was no evidence of the specific duties performed by the Grievants. This is simply a recycling of the argument that a work related activity is limited to one which is an integral part of a principal activity. The ALJ's conclusion as to the scope of ¶ (g) was based on management's requiring the security checks, which could not be accomplished offsite and which were a prerequisite to commencement and completion of a day's work. Further, the Grievants were subject to management's assignment while awaiting a security clearance, and the length of that delay was subject to the control of management. Under this reasonable construction of ¶ (g), it is immaterial what the integral parts of the principal activities of the Grievants might have been.

The Department argues that clearing security checkpoints cannot be job-related because third parties, such as tradespersons and visitors to inmates, are subjected to security searches. It is not altogether clear, factually, whether such third parties are permitted to enter the area in which the Grievants have their ordinary workstations. In any event, we are concerned here with an aspect of the employment relationship between the Grievants and the State, and not with the impact of security at ECI on third parties.

Further, the Department claims that "[u]nder the ALJ's reasoning the State would be required to compensate employ-

ees who work in State office buildings from the moment the employees enter the building and begin to walk toward their offices, climb the stairs, or wait for an elevator, inasmuch as these activities are as equally 'job-related' as waiting to be searched." Appellant's brief at 9. This opinion, however, forecasts nothing of the kind. It is limited to the facts presented in this case. If any grievance cases arise in the future in which a line must be drawn between commuting and job-related activity, it will be drawn by the Secretary, in the exercise of Executive Department functions, before there is any judicial review.

The Department also cites, and attached to their brief, apparently as potentially persuasive authority, an unreported opinion of the Court of Special Appeals. We need not analyze it. Maryland Rule 1–104.

For all the foregoing reasons, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR SOMER- SET COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**