908 A.2d 665

Peter G. MANIAN, et al.

v.

**COUNTY COUNCIL FOR MONTGOMERY COUNTY,** Maryland, Sitting as the District Council, et al.

**No. 1305, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 29, 2006.

David W. Brown, Rockville, for appellant.

Clifford L. Royalty (Marc P. Hansen, Charles W. Thompson, Jr., County Atty., on brief), Rockville, for appellee.

Panel MURPHY, C.J., KENNEY, LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

RODOWSKY, J.

This Montgomery County zoning case challenges the approval of development plan amendment (DPA) 03–2 relating to the construction of six townhouses, including a dental office. Appellants, plaintiffs below, Peter G. and Samuel R. Manian (the Manians), own a single family residence adjoining the proposed development to the north. Appellee, the County Council for Montgomery County, Maryland Sitting as a District Council for that Portion of the Maryland–Washington Regional District Within Montgomery County (the Council),

approved DPA 03–2. In an action for judicial review, the Circuit Court for Montgomery County affirmed the Council. The Manians have advanced certain technical arguments in support of their contention that DPA 03–2 fails to comply with Montgomery County Code (2004), Chapter 59, "Zoning Ordinance." The principal issue is whether these arguments should have been addressed by the Council at the development plan amendment approval stage or are to be addressed by the Planning Board at the site plan approval stage. As explained below, we shall hold that the latter is the appropriate stage.

In October 1995, the Council approved Local Map Amendment (LMA) # G–720, which rezoned about 1.2 acres in Bethesda as a Transit Station–Residential (TS–R) zone, a floating zone. This land consisted of two separately owned parcels, Parcel A and Parcel B (together "the TS–R Site"). The TS–R Site lies at the intersection of Arlington Road, a north-south street, and Edgemoor Lane, an east-west street. Parcel A is situated at the northeast corner and Parcel B at the southeast corner. Approximately three years later, townhouses were constructed on Parcel B pursuant to LMA # G–720.

LMA # G–720 originally had provided that eight townhouses would be constructed on Parcel A. Through DPA 03–2, submitted on March 21, 2003, the project's developers sought to amend the development plan for Parcel A to permit construction of six townhouses. One is to include a 1,000 square foot dental office.[1] All would have rear basement garages and rooftop terraces.

TS–R zoning is authorized by Article C, Division 8, of the Zoning Ordinance. See § 59–C–8.1.[2] The TS–R zone and its

---

1. A dental office was originally permitted on Lot A by special exception BA–2183, granted by the Montgomery County Board of Appeals in 1967. LMA # G–720 rezoned Lot A to TS–R, in which a medical office is a permitted use. Therefore, the special exception was revoked in 2002.

2. Unless otherwise indicated, all statutory references in this opinion are to the Montgomery County Zoning Ordinance, Chapter 59 of the Mont-

companion, the TS–M zone, as their names imply, are intended for use in transit station development areas. § C–8.21(a). The TS–R zone "may also be used in an area adjacent to a Central Business District, within 1,500 feet of a metro transit station." *Id.* Another legislative intent in creating these zones is set forth in § C–8.21(d), as follows:

"In order to facilitate and encourage innovative and creative design and the development of the most compatible and desirable pattern of land uses, some of the specific restrictions which regulate, in some other zoning categories, the height, bulk and arrangement of buildings and the location of the various land uses are eliminated and the requirement substituted that all development be in accordance with a plan of development meeting the requirements of this division."

The purposes of the TS–R zone are set forth in § C–8.22. These include providing "the maximum amount of freedom possible in the design of buildings and their grouping and layout within the areas classified in this zone[.]" § C–8.22(d).

The procedures for applying for, and approval of, a reclassification to a TS–R zone are set forth in § C–8.45, which provides in relevant part:

"(a) Application and development plan approval shall be in accordance with the provisions of division 59–D–1.

"(b) Site plans shall be submitted and approved in accordance with the provisions of division 59–D–3."

"Development standards" for the TS–R and TS–M zones, relating to minimum area, density of development, and two types of open space, are set forth in § C–8.4. The "[m]inimum percentage of net area devoted to public use space" is ten percent, § C–8.43(a), and the "[m]inimum percentage of net area devoted to active and passive recreational purposes," for

gomery County Code (2004). In citing to sections of the Zoning Ordinance we shall omit the prefix "59," indicating Chapter 59, and shall cite merely to the letter denoting the article of that chapter and to the numerals denoting the division of the article and the specific section of that division.

a project with a site area of 40,000 sq. ft. or more, is twenty-five percent. § C–8.43(b) and n. 1. The twenty-five percent development standard applies to the TS–R Site which contains 48,799 sq. ft. In this case the Manians contend that each of the two standards relating to open space is violated in approved DPA 03–2.

Article D deals with development plans. Development in certain zones, including the TS–R zone, "is permitted only in accordance with a plan approved by the [Council] at the time the land is classified in one of [these] zones[.]" § D–1.1. In order to achieve the flexibility of design needed for the implementation of the purposes of a TS–R zone, "the applicant is required to submit a development plan as a part of the application for reclassification." § D–1.2.

A development plan that underlies a LMA may be amended. § D–1.74(a). The application is referred to the Planning Board for review and recommendation. *Id.* Presumably, that Board applies the same criteria as applied to an application for original reclassification, *i.e.,* "whether the application and the accompanying development plan fulfill the purposes and requirements of the applicable zone." § D–1.4. In the instant matter, the Planning Board recommended approval of the amendment to the development plan.

Here, where there was public opposition to the requested amendment, a hearing examiner conducted a public hearing. § D–1.74(d). For purposes of the public hearing, and the examiner's report and recommendation, the development plan amendment is considered a part of the application. § D–1.5. In the instant matter, the hearing examiner filed a sixty-one page report recommending approval of the requested amendment to LMA # G–720, subject to certain conditions.

One subject of these conditions related to the difference between illustrative elements on the development plan, which could be changed during site plan review, and binding elements which, in the examiner's words, "cannot be changed without a separate application to the ... Council for another development plan amendment." The report stated:

"To avoid confusion as to what is binding and what is not, the Hearing Examiner will recommend that the Council's Resolution require the Applicant's position, which is clear in the record, be reflected on the face of the final Land Use Plan submitted for certification. Applicant can accomplish this by adding the following notation to the submitted plan:

" 'The site layout shown on this Land Use Plan is illustrative, except to the extent that it shows the number, general locations, minimum setbacks and uses of the proposed structures, all of which are binding elements. The charts showing the Development Standards for [Parcel A] alone and for the [TS–R Site] are binding to the extent they show the maximum Floor Area Ratio, the maximum Gross Floor Area, the maximum Number of Units, the minimum Public Use Space, the minimum Active/Passive Recreation Space, the minimum Total Open Space, the minimum Number of Parking Spaces and the minimum Dedication to Public Use.'

"Thus the binding elements here include the number of new residential units (6, instead of the 8 originally planned for Parcel A); . . . the minimum public use space (1,185 sq. ft. which is 10% of Parcel A, and 5,393 sq. ft. which is 11% of the total G–720 land); [and] the minimum active/passive recreation space (2,963 sq. ft., which is 25% of Parcel A, and 15,392 sq. ft., which is 32% of the total G–720 land)[.]"

The next step in the process was consideration by the Council. § D–1.7(e). The Manians contend, and we shall assume, that before approving a development plan amendment, the Council is required to fulfill its obligations under § D–1.61, "Findings." That section provided: [3]

"Before approving an application for classification in any of these zones [including TS–R], the [Council] must consider whether the application, including the development plan, fulfills the purposes and requirements set forth in article 59–C for the zone. In so doing, the [Council] must make

---

**3.** We set forth § D–1.61 as amended through November 1998, the form of that section at the time of the Council's action in the instant matter.

the following specific findings, in addition to any other findings which may be necessary and appropriate to the evaluation of the proposed reclassification:

"(a) That the zone applied for is in substantial compliance with the use and density indicated by the master plan or sector plan, and that it does not conflict with the general plan, the county capital improvements program or other applicable county plans and policies.

"(b) That the proposed development would comply with the purposes, standards, and regulations of the zone as set forth in article 59–C, would provide for the maximum safety, convenience, and amenity of the residents of the development and would be compatible with adjacent development.

"(c) That the proposed internal vehicular and pedestrian circulation systems and points of external access are safe, adequate, and efficient.

"(d) That by its design, by minimizing grading and by other means, the proposed development would tend to prevent erosion of the soil and to preserve natural vegetation and other natural features of the site. Any applicable requirements for forest conservation under Chapter 22A and for water resource protection under Chapter 19 also must be satisfied. The [Council] may require more detailed findings on these matters by the planning board at the time of site plan approval as provided in division 59–D–3.

"(e) That any documents showing the ownership and method of assuring perpetual maintenance of any areas intended to be used for recreational or other common or quasi-public purposes are adequate and sufficient."

The Council approved the amendment to the development plan on October 12, 2004. Its opinion did not incorporate by reference the report of the hearing examiner. The most specific statement in the opinion covering the TS–R open space standards is: "Applicant's Land Use Plan demonstrates

compliance with the development standards specified in Section 59–C–8.4." Resolution 15–787, by which the Council approved DPA 03–2, included, as a condition of the approval, that the charts on the revised "Land Use Plan" bear the notation that they are binding concerning, *inter alia,* the "minimum Public Use Space [and] the minimum Active/Passive Recreation Space[.]" Further, the Council noted that "[i]n addition to this zoning review, the proposed development will also be subject to the review and approval of a Preliminary Plan of Subdivision and a Site Plan by the Planning Board."

Both in oral argument before the Council, allowed by § H–6.5, and in its evidentiary case before the hearing examiner, the Manians had contended that the open space for public use and the open space for active/passive recreation had been improperly calculated so that, in fact, the applicable standards under § C–8.43 had not been met. In this Court, they submit, *inter alia,* that the Council approved the amendment without explaining why the Manians' calculations were wrong and that the Council thereby violated § D–1.61(b) requiring the Council to make findings that "the proposed development would comply with the ... standards ... of the zone." The remedy sought by appellants is a remand to the Council with directions to make more specific findings.

Approval of an amended development plan, as in the instant matter, does not exhaust the requirements for developing in a Transit Station Development Area Zone. Site plans must be submitted and approved in accordance with division D–3. § C–8.45(b). "[N]o building or use-and-occupancy permit for the construction or use of any building or structure may be issued until a site plan is approved and unless it is in accordance with an approved site plan." § D–3.0. Site plan approvals are the province of the Planning Board. In reaching a decision whether to approve, the Board must determine whether "the site plan is consistent with an approved development plan" and "meets all of the requirements of the zone in which it is

located." § D–3.4(a)(1) & (2).[4]

In the instant matter, it is the Council's position that the Planning Board, in the process of site plan review, will determine the compliance, *vel non*, of the calculations underlying the percentages of the TS–R Site that are devoted to open space and determine whether the site plan complies with the development plan's binding elements concerning open space that are a condition of the Council's approval of the development plan.

The Manians sought judicial review in the Circuit Court for Montgomery County of DPA 03–2. Aggrieved by that court's affirmance of the Council's action, they brought the appeal that is now before us.

In this Court, the Manians present a single question for review. They ask (upper case type reduced):

"Whether District Council Resolution 15–787 (Oct. 12, 2004) is legally sufficient in light of its failure to address and resolve a number of substantial claims petitioners presented at the hearing on DPA 03–02 to show that the plan is not in compliance with the purposes, development standards and regulations for the applicable zone, given that the Council was required to find such compliance under § 59–D–1.61(b), Montgomery County Code."

Four arguments are presented under that question heading:

"A. DPA 03–02 Is Not In Compliance With The Public Use Space Development Standard In § 59–C–8.43(a);

"B. The TS–R Site Is Not In Compliance With The Active/Passive Recreation Space Development Standard In § 59–C–8.43(b);

---

4. Section D–3.4 was amended by Ord. No. 15–63, effective as to site plan approved on or after April 1, 2006. New § D–3.4(c) in part provides:

"(c) In reaching its decision the Planning Board must require that:
"(1) the site plan conforms to all non-illustrative elements of a development plan[.]"

"C. The Townhouses Proposed for DPA 03–02 Violate The Dispersed Multiple Direct Entrance Requirement of § 59–A–2.1 and § 59–C–8.3; [and]

"D. One of the Townhouses Proposed for DPA 03–02 Violates The Two Parking Spaces Per Dwelling Unit Requirement Development Standard in § 59–E–3.7 and § 59–E–3.4."

Additional facts will be stated, as necessary, in the discussion of these arguments. Arguments A and B we consider in Part I, *infra*, and arguments C and D we consider in Part II, *infra*.

# I

■ Contrary to the 5,393 sq. ft. of public use open space the developer proposes to provide on the TS–R Site, an amount in excess of the required minimum of 4,880 sq. ft., the Manians contend that only 2,524 sq. ft. are provided. They contend that proposed public use space on Parcel A improperly includes land to be dedicated to public sidewalk use and an area for the exclusive use of owners. The largest discrepancy charged by appellants relates to the already developed Parcel B. They contend that the developer and the Council improperly considered the 4,208 sq. ft. of public use open space proposed in LMA G–720 for Parcel B actually to have been provided, whereas the appellants calculate the area actually provided to be 1,388 sq. ft. All of these alleged deficiencies produce public use space comprising only 5.2% of the TS–R Site. The appellants' contention concerning active/passive recreation space is similar. They argue that rooftop terraces on the six townhouses proposed for Parcel A cannot qualify as active/passive recreation space.

Whether these issues are to be resolved by the Council, as appellants contend, or by the Planning Board, as appellee contends, largely turns on the construction of § D–1.61(b).

The interpretation of a statute is a judicial function. *Bennett v. State Dep't of Assessments & Taxation*, 143 Md.App. 356, 367, 795 A.2d 124, 130 (2001); *Rouse–Fairwood Dev. Ltd.*

**48**

*Partnership v. Supervisor of Assessments for Prince George's County*, 138 Md.App. 589, 619, 773 A.2d 535, 553 (2001). The primary goal of statutory construction is to ascertain and effectuate the intent of the Legislature. *Johnson v. Mayor & City Council of Baltimore City*, 387 Md. 1, 11, 874 A.2d 439, 445 (2005). In ascertaining legislative intent, the words of the statute are to be given their ordinary meaning. *Ridge Heating, Air Conditioning & Plumbing, Inc. v. Brennen*, 366 Md. 336, 350, 783 A.2d 691, 699 (2001). Furthermore, courts are to construe statutes as a whole, considering all provisions together and, to the extent possible, reconciling and harmonizing provisions. *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93, 104 (1994).

Here, § D–1.61 directs the Council to "consider" whether an application fulfills the purposes and requirements of the zone. Appellants do not question that this was done. In making its broad conclusion that a development plan fulfills the purposes and requirements of the zone, "the district council must make the following specific findings[.]" There are five such findings, three of which (a, c, and e) require a finding that is stated in the present tense,[5] while two of the requirements call for a finding that the proposed development "would" comply.[6]

Courts may ascertain from a dictionary the common meaning of words used in a statute. *Harvey v. Marshall*, 389 Md. 243, 260–61 n. 11, 884 A.2d 1171, 1181 n. 11 (2005); *State Dep't of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 14, 702 A.2d 690, 696 (1997). "Would" is "used in auxiliary function to express plan or intention <promised that we [would] correct ... mistakes— Virginia Prewett> <deciding that they [would] visit as many

---

5. The finding called for by subsection (a) is that "the zone applied for is in substantial compliance with" aspects of the master plan. Subsection (c)'s finding is that "vehicular and pedestrian circulation systems ... are safe[.]" Subsection (e)'s finding is that certain documents "are adequate and sufficient" for their purposes.

6. Subsection (b)'s finding is that "the proposed development would comply with the ... standards[.]" Subsection (d)'s finding is that the design of the proposed development "would tend to prevent erosion[.]"

friends as possible>." Webster's Third New International Dictionary of the English Language (G. & C. Merriam Co.1976); "would" means "the feeling or expression of a conditional or undecided desire or intention." The Oxford English Dictionary (Oxford University Press, 1971).

Because the subjects of subsections (b) and (d) are the "proposed development," the requirement necessarily is expressed as a matter of the Council's intention concerning the finished development. The development plan for a TS–R Zone primarily relates to the zoning decision concerning the compatibility of the project with the surrounding community and the master plan, while more specific detail of the project is to be furnished at the stage of site plan approval. Here, the Council manifested its intent that the subject development would comply with the standards of § C–8.43(a) and (b) by making the developer's calculations of compliance with standards, as reflected in charts on the development plan, binding elements of that plan and conditions of the Council's approval. In this way, the Council performed its obligations under § D–1.61(b). If, as the project is more fully defined at the site plan stage, the Planning Board concludes that the developer's calculations of compliance with standards are based on erroneous interpretations or applications of the zoning ordinance, or are otherwise erroneous, then there will have been no development plan amendment approval, and the Planning Board will not be authorized to issue a site plan approval. See § D–3.4(a)(1).

 This construction of § D–1.61(b) is consistent with the administrative practice, as acknowledged before the hearing examiner by Kenneth Doggett, the Manians' expert. He stated that the "ultimate decision" regarding "what qualifies as public open space and what qualifies as passive and active space" is left to the "Planning Board at [the] time of site plan[.]"

" '[A]n administrative agency's interpretation and application of the statute which the agency administers should

ordinarily be given considerable weight by reviewing courts.' "

*Department of Pub. Safety & Corr. Servs. v. Palmer,* 389 Md. 443, 452, 886 A.2d 554, 559 (2005) (quoting *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 571–72, 873 A.2d 1145, 1154–55 (2005)(internal citations omitted)); *see also State Bd. of Physicians v. Bernstein,* 167 Md.App. 714, 750, 894 A.2d 621, 642 (2006).

For these reasons the Council did not err by not specifically addressing the Manians open space arguments.

## II

Appellants' remaining two arguments concern exterior doors to the townhouses and parking spaces for the townhouse that is planned to include a dental office. In support of their contention that it was the obligation of the Council to answer appellants' contentions concerning these two aspects of the project, they refer us only to § D–1.61(b). The Manians, however, do not clarify whether their reliance is on the clause reading that "the proposed development would comply with the purposes, standards, and regulations of the zone as set forth in article 59–C," or on the clause reading that the proposed development "would provide for the maximum safety, convenience, and amenity of the residents of the development."

With respect to external doors, appellants' argument begins with § A–2.1, the definitional section for Chapter 59. The definition of "[d]welling unit, townhouse" includes the statement that "[e]ach townhouse must have a minimum of 2 direct entrances from the outside, either on the front and rear or front and side." The development plan proposes three external entrances, two at different levels on the front and one in the rear through the garage. Appellants then invoke the International Residential Code for One-and Two–Family Dwellings, § R311.1 which requires not less than one exit door from each dwelling unit and further provides that that required door "provide for direct access from the habitable

portions of the dwelling to the exterior without requiring travel through a garage." [7]

Appellants' parking space argument begins with § E–3.7 which establishes a base requirement of "[t]wo parking spaces for each townhouse." The submission is that this requirement is not complied with because, during business hours, the two parking spaces for the dental office/townhouse will be used as one parking space for disabled persons, and other patients and visitors will be required to use off-site parking.

The Council made a general finding that the proposed development would comply with the second clause of § D–1.61(b), but the Council did not specifically address appellants' arguments. The Council did state that "[t]he Planning Board will be required to decide on the propriety of off-site parking, but there is no evidence that the proposed parking for this modest development will have more than a 'minimal impact' on the adjoining residential properties."

■ Inasmuch as neither of the Manians' arguments relies on provisions in Article C of the Zoning Ordinance, the asserted duty of the Council cannot rest on the first clause of § D–1.61(b). It must rest on the second clause, requiring a finding that the proposed development "would provide for the maximum safety, convenience, and amenity of the residents[.]"

In view of our holding in Part I, *supra,* dealing with standards imposed by Article C, the arguments considered in this Part II are even further removed from demonstrating a duty on the Council to analyze detail. The Council was not obligated by the second clause of § D–1.61(b) to analyze or respond in detail to the arguments advanced by the Manians. These arguments similarly can be addressed by the Planning Board at site plan review.

---

**7.** We note that the ICC International Building Code has been adopted by Montgomery County as the "basic County building code" through Chapter 8, "Buildings," § 14, "Standards applicable" of the Montgomery County Code.

In short, we hold that appellants' arguments are premature, and we intimate no opinion on their substantive validity.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANTS.**